# United States Court of Appeals
## For the First Circuit

Nos. 04-2313; 04-2334; 04-2397

GLOBAL NAPS, INC.,

Plaintiff, Appellee/Cross-Appellant,

v.

MASSACHUSETTS DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY;
PAUL B. VASINGTON, in his capacity as Commissioner; JAMES
CONNELLY, in his capacity as Commissioner; W. ROBERT KEATING, in
his capacity as Commissioner; DEIRDRE K. MANNING, in her capacity
as Commissioner; EUGENE J. SULLIVAN, in his capacity as
Commissioner; and VERIZON NEW ENGLAND, INC.,

Defendants, Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, <u>U.S. District Judge</u>]

Before

Lynch and Howard, <u>Circuit Judges</u>,
and Restani,[*] <u>Judge</u>.

<u>Daniel J. Hammond</u>, Assistant Attorney General, with whom
<u>Thomas F. Reilly</u>, Attorney General, was on brief, for Massachusetts
Department of Telecommunications and Energy and Paul B. Vasington,
James Connelly, W. Robert Keating, Deirdre K. Manning, and Eugene
J. Sullivan, in their official capacities as Commissioners.

---

[*] Chief Judge of the United States Court of International
Trade, sitting by designation.

Scott H. Angstreich, with whom Bruce P. Beausejour, Keefe B. Clemons, Sean A. Lev, and Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., were on brief, for Verizon New England, Inc.

William J. Rooney, Jr., with whom Jeffrey C. Melick was on brief, for Global NAPs, Inc.

_____

October 18, 2005

_____

**LYNCH, Circuit Judge**. This case raises a new issue of importance under the Telecommunications Act of 1996 (TCA), Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.). The question is whether the doctrine of issue preclusion applies so as to bind one state's commission to apply the findings and conclusions of another state's commission in disputes between the same parties about the interpretation of identical contract language contained in different state interconnection agreements.

The district court concluded that the Full Faith and Credit Clause compelled application of the doctrine. Its order bound the Massachusetts Department of Telecommunications and Energy (DTE), which was interpreting a Massachusetts interconnection agreement between Global NAPs, Inc. (Global) and Verizon New England, Inc. (Verizon), to follow the earlier decision of the Rhode Island Public Utility Commission (RIPUC) as to the effect of a prior order by the Federal Communications Commission (FCC) on the parties' Rhode Island interconnection agreement. On de novo review, we reverse. The district court's reasoning is contrary to the language of and policies behind the TCA.

Underlying this legal issue is the question of whether Verizon owes an estimated $30 to $50 million in payments to Global as "reciprocal compensation" for calls placed by Verizon's customers to Global's customers connected through an internet

-2-

service provider (ISP) in Massachusetts during the period from July 24, 2000 to June 14, 2001.

The DTE ruled on June 24, 2002 that Verizon did not owe the reciprocal compensation sought. On Global's federal court challenge to the DTE order, the court vacated and remanded the DTE order, ruling that the DTE could not base its decision on an interpretation of the interconnection agreement that was contrary to the interpretation reached by the RIPUC on that point; its remand, however, also allowed that differences between Massachusetts and Rhode Island law might lead the DTE to a different ultimate outcome as to payment of reciprocal compensation. Global NAPs, Inc. v. Verizon New Eng., Inc. (Global NAPs II), 332 F. Supp. 2d 341, 374-75 (D. Mass. 2004). Verizon and the DTE took this interlocutory appeal. We reverse and remand to the district court for further proceedings consistent with this opinion.[1]

**I.**

The TCA was enacted to "promote competition and reduce regulation in order to secure lower prices and higher quality

---

[1] This case raises different issues than those raised in Global NAPs, Inc. v. Verizon New England, Inc., 396 F.3d 16 (1st Cir. 2005); that case revolved around the parties' attempts to negotiate a new interconnection agreement to replace the one at issue here. A separate district court case involving an earlier interconnection agreement between Global and Verizon is tangentially related for reasons that will become apparent below. See Global NAPs, Inc. v. New Eng. Tel. & Tel. Co. (Global NAPs I), 226 F. Supp. 2d 279 (D. Mass. 2002).

services for American telecommunications consumers." 110 Stat. at 56. One of the overriding aims of the TCA was to introduce competition into the market for local telephone service, which previously had been monopolized by state-regulated entities created after the break up of the American Telephone and Telegraph Company (AT&T). See Verizon Commc'ns. Inc. v. FCC, 535 U.S. 467, 475-76 (2002). Under the TCA, incumbent local exchange carriers (ILECs) -- that is, the former local phone monopolies -- must allow competitive local exchange carriers (CLECs) to interconnect with their phone networks. See 47 U.S.C. § 251(c). Interconnection allows customers of CLECs to receive calls from, and place calls to, customers of ILECs.

The TCA imposes a number of duties on local exchange carriers. See id. §§ 251-52. Most important, for present purposes, is the duty of all local exchange carriers, whether incumbent or competitive, "to establish reciprocal compensation arrangements for the transport and termination of telecommunications." Id. § 251(b)(5). As between two local exchange carriers, a "reciprocal compensation arrangement" is "one in which each of the two carriers receives compensation from the other carrier for the transport and termination on each carrier's network facilities of telecommunications traffic that originates on the network facilities of the other carrier." 47 C.F.R. § 51.701. For example, generally when a customer of local exchange carrier A

-4-

calls a customer of local exchange carrier B -- so that B must complete the call -- A must share with B some of the revenues it receives from its customer to compensate B for use of its facilities. See Ill. Bell Tel. Co. v. WorldCom Techs., Inc., 157 F.3d 500, 501 (7th Cir. 1998). The FCC has ruled that the reciprocal compensation obligations under § 251(b)(5) only extend to traffic that begins and terminates within a local area. See Local Competition Provisions in the Telecomms. Act of 1996, 11 F.C.C.R. 15499, 16012-13, 16015-16 (1996) (subsequent history omitted); Pac. Bell v. Pac-West Telecomm Inc., 325 F.3d 1114, 1120 (9th Cir. 2003).

The TCA requires ILECs to negotiate interconnection agreements with CLECs to provide the terms of interconnection and "fulfill the duties" enumerated in § 251, including the duty to establish reciprocal compensation arrangements. 47 U.S.C. § 251(c)(1). These agreements can be concluded through voluntary negotiation or mediation, id. § 252(a), or if these methods fail, through compulsory arbitration, id. § 252(b). Alternatively, a CLEC has the option of adopting one of the ILEC's interconnection agreements that had been previously approved within that state. Id. § 252(i). Once the parties finalize their interconnection agreement, it must be submitted to the relevant state's commission for approval. Id. § 252(e).

A long-running battle has ensued over whether ISP-bound traffic is "local telecommunications traffic" subject to reciprocal compensation within the meaning of the TCA. See, e.g., Bell Atl. Tel. Cos. v. FCC, 206 F.3d 1, 2-3 (D.C. Cir. 2000). The debate centers around the question of whether ISP traffic "terminates" at an ISP when a user in one state dials into a local ISP and visits a website hosted on a server in another state. The issue could be argued both ways. One could consider such calls to terminate at the ISP, with communications between the ISP and the out-of-state website considered a separate transaction unrelated to the call. Alternatively, one might consider the call to have terminated in the state where the web server is located. See id. at 5. Generally, CLECs like Global tend to have more ISP customers than do ILECs like Verizon. Since ISPs receive calls that are generally much longer than voice calls, and do not place calls of their own, carriers with more ISP customers will be net beneficiaries of a reciprocal compensation scheme that includes ISP traffic. CLECs and ILECs, then, have opposing interests. See id. at 3.

In 1998, Global and Verizon began negotiations for an interconnection agreement in Rhode Island. Global NAPs II, 332 F. Supp. 2d at 350. Rather than submitting their dispute over reciprocal compensation for ISP traffic to arbitration, Verizon and Global agreed to the following compromise provision, § 5.7.2.3, the language of which is at the heart of the present dispute:

-6-

The Parties . . . disagree as to whether . . . "ISP Traffic" . . . constitutes Local Traffic as defined herein, and the charges to be assessed in connection with such traffic. The issue of whether such traffic constitutes Local Traffic on which reciprocal compensation mus[t] be paid pursuant to the [TCA] is presently before the FCC in CCB/CPD 97-30 and may be before a court of competent jurisdiction. The Parties agree that the decision of the FCC in that proceeding, or [of] such court, shall determine whether such traffic is Local Traffic (as defined herein) and the charges to be assessed in connection with ISP Traffic. If the FCC or such court determines that ISP Traffic is Local Traffic, as defined herein, or otherwise determines that ISP Traffic is subject to reciprocal compensation, it shall be compensated as Local Traffic under this Agreement unless another compensation scheme is required under such FCC or court determination. <u>Until resolution of this issue</u>, [Verizon] agrees to pay GNAPS Reciprocal Compensation for ISP traffic . . . . (emphasis added)

Contemporaneous interconnection agreements between Global and Verizon in New York, Maine, New Hampshire, and Vermont contained an identical provision. The Massachusetts interconnection agreement in effect between the parties at this time did not contain this provision.

On February 26, 1999, the FCC issued its ruling in Docket No. CCB/CPD 97-30, the proceeding specifically referred to in § 5.7.2.3.[2] In this decision, the FCC concluded that ISP-bound traffic is "largely interstate" and thus did not fall under the reciprocal compensation duties imposed by 47 U.S.C. § 251. <u>Local Competition Provisions in the Telecomms. Act</u> (<u>Internet Traffic Order</u>), 14 F.C.C.R. 3689, 3705-06 (1999). The FCC suggested that

---

[2] The FCC consolidated Docket No. CCB/CPD 97-30 into Docket No. 96-98. <u>Global NAPs II</u>, 332 F. Supp. 2d at 350-51.

its decision "might cause some state commissions to re-examine" their decisions "to the extent that [they] are based on a finding that [ISP] traffic terminates at an ISP server." Id. at 3706. But the FCC also stated that it did not intend to "preclude[] state commissions from determining, pursuant to contractual principles or other legal or equitable considerations, that reciprocal compensation is an appropriate interim inter-carrier compensation rule" pending final rulemaking by the FCC on such compensation for ISP-traffic. Id.

Soon after the FCC issued the Internet Traffic Order, Verizon stopped making reciprocal compensation payments to Global under the Rhode Island interconnection agreement and other agreements containing § 5.7.2.3. Global filed a complaint with the RIPUC under the Rhode Island agreement, contending that it was entitled to continued payments because the condition for non-payment -- "resolution of [the] issue" -- had not been met: it argued that the Internet Traffic Order had left to state commissions the ability to determine whether reciprocal compensation payments were required under "contractual principles or other legal or equitable considerations." Verizon argued to the contrary: that the FCC had effectively resolved the issue in deciding that ISP traffic was non-local interstate traffic not subject to the reciprocal compensation duties imposed by 47 U.S.C. § 251. The RIPUC agreed with Global and found that the Internet

Traffic Order did not resolve the issue of whether "ISP Traffic constitutes 'local traffic' for which reciprocal compensation must be paid under the [interconnection agreement]." It relied in part on a prior order in which it had held that "in the absence of a federal rule establishing an appropriate interstate mechanism," it had "the authority to resolve disputes concerning reciprocal compensation provisions contained in [interconnection agreements]." It appears that at the time, the RIPUC had not yet come to any conclusion on "whether ISP Traffic is subject to reciprocal compensation"; it had only just "opened a general inquiry into the issue." The RIPUC remarkably concluded "the undisputed fact that [Global] has filed a complaint against [Verizon] . . . creates a presumption that the 'issue' has not been resolved." Since Verizon could not rebut this presumption, RIPUC found that § 5.7.2.3 "clearly and unambiguously requires [Verizon] to make reciprocal payments to [Global]." Verizon did not contest this ruling, and resumed reciprocal compensation payments to Global for ISP traffic in Rhode Island.

Meanwhile, in Massachusetts, the story developed quite differently. Global NAPs and Verizon's first interconnection agreement in Massachusetts was signed in 1997.[3] Global NAPs II, 332 F. Supp. 2d at 350. In October 1998, the DTE ruled that FCC

---

[3] In Global NAPs I, the court dealt with the issue of reciprocal compensation under this earlier agreement. 226 F. Supp. 2d at 289-90.

precedent bound it to conclude that ISP traffic was subject to reciprocal compensation. Id. But after the FCC issued its Internet Traffic Order, the DTE revisited its October 1998 decision. In May 1999, the DTE held that as of February 26, 1999, the date of the Internet Traffic Order, local exchange carriers in Massachusetts were no longer required to pay reciprocal compensation for ISP-bound traffic. Id. at 352. In this order, the DTE referred to the Internet Traffic Order as "liberating," since it had previously felt bound by FCC precedent to treat ISP traffic as local traffic subject to reciprocal compensation under the TCA.[4] Id.

On March 24, 2000, in the first appeal of the Internet Traffic Order, the D.C. Circuit vacated the Internet Traffic Order and remanded to the FCC, finding that the FCC's rationale for treating ISP-bound traffic as interstate traffic for the purposes of reciprocal compensation was inadequate. See Bell Atl. Tel. Cos. 206 F.3d at 9. The D.C. Circuit was to revisit this issue later.

In the interim, on June 16, 2000, the FCC approved the merger of Verizon's predecessors into Verizon. See Application of GTE Corp., Transferor, and Bell Atl. Corp., Transferee (Merger Order), 15 F.C.C.R. 14032 (2000). As one of the conditions for

---

[4] This May 1999 order was vacated in Global NAPs I, because the DTE had failed to consider whether reciprocal compensation might be required under contract law or other legal or equitable principles, as the Internet Traffic Order allowed it to do. Global NAPs I, 226 F. Supp. 2d at 288-89, 294-95.

approval of the merger, the FCC required Verizon to allow a CLEC in any one state to adopt any of Verizon's interconnection agreements previously approved by a different state commission. Id. app. D at 14310; see also 47 U.S.C. § 252(i); 47 C.F.R. § 51.809 (allowing a CLEC to adopt one of an ILEC's interconnection agreements previously approved within that state). The provision containing this condition is referred to by the parties and the district court as "Paragraph 32." Paragraph 32 included the following language: "[Verizon] shall not be obligated to provide pursuant to this Paragraph any interconnection arrangement . . . unless it . . . is consistent with the laws and regulatory requirements of . . . the state for which the request is made." Merger Order, 15 F.C.C.R. at 14310.

On July 24, 2000, Global notified Verizon that, pursuant to Paragraph 32, it wished to adopt the Rhode Island interconnection agreement for the parties' dealings in Massachusetts. However, Verizon and Global disagreed as to whether § 5.7.2.3 could be adopted under Paragraph 32. On November 15, 2000, the parties agreed that, effective back to July 24, 2000, Global could adopt in Massachusetts all provisions of the Rhode Island agreement that were consistent with Paragraph 32, thus reserving Verizon's right to contest the adoption of § 5.7.2.3. During pendency of negotiations between the parties, Verizon did not pay Global reciprocal compensation for ISP-bound traffic.

On April 27, 2001, Global filed a complaint with the FCC, claiming it was entitled to adopt § 5.7.2.3 and seeking damages based on its interpretation of that section. On February 21, 2002, the FCC held that Verizon was required to offer the entire Rhode Island agreement, including § 5.7.2.3, to Global in Massachusetts. See Global NAPs, Inc. (Paragraph 32 Order), 17 F.C.C.R. 4031, 4039 (2002). Importantly, it also noted that under the terms of Paragraph 32, "only the relevant state commission may ultimately decide whether particular terms of the agreement should be adopted in that state, and if so, what those terms mean." Id. at 2039 (emphasis added). The FCC also held that Global's damages claim was "premature" because the DTE had yet to approve an interconnection agreement between the parties that contained the contested provision. Id. at 2040.

In the meantime, the FCC issued an order in response to the D.C. Circuit's remand of the Internet Traffic Order. See Local Competition Provisions in the Telecomms. Act of 1996 (Order on Remand), 16 F.C.C.R. 9151 (2001). In the Order on Remand, the FCC held once again that the "provisions of section 251(b)(5) do not extend to ISP-bound traffic" but rested its decision on different legal grounds. Id. at 9153. In addition, the FCC set up a new compensation scheme for ISP-bound traffic, which would become effective starting June 14, 2001. The FCC also made clear that it had exclusive regulatory authority to address the issue, so that

state commissions no longer have the power to do the same.  Id. at 9168-69, 9189.  In its consideration of the Order on Remand, the D.C. Circuit held that the FCC could not validly base its actions on the new legal grounds.  See WorldCom, Inc. v. FCC, 288 F.3d 429, 433-34 (D.C. Cir. 2002).  It did not vacate the FCC order, but found the agency needed to provide a different rationale.  Id. at 434.  The result is that the Order on Remand still remains in force.  See Verizon Md. Inc. v. Global NAPs, Inc., 377 F.3d 355, 367 (4th Cir. 2004).

Thus, the parties here agree that the Order on Remand "resolved" the question of reciprocal compensation for ISP traffic by setting up a new compensation scheme from June 14, 2001 going forward.[5]  But in Massachusetts there remains the question of reciprocal compensation for ISP-bound traffic between July 24, 2000 (when the language of the Rhode Island agreement went into effect in Massachusetts through the Massachusetts interconnection agreement) and June 14, 2001 (when the alternative compensation scheme in the Order on Remand went into effect).  See Global NAPs II, 332 F. Supp. 2d at 355.

In March 2002, Verizon submitted the Massachusetts interconnection agreement containing terms identical to those in the Rhode Island agreement for retrospective approval by the DTE.

---

[5]  There is no dispute in Rhode Island that this is the effect of the Order on Remand.

-13-

Before the DTE, Global argued that since it and Verizon had fully litigated the issue of whether the Internet Traffic Order was "resolution of this issue" under the identically worded Rhode Island agreement before the RIPUC, the DTE was collaterally estopped from relitigating the same. The DTE rejected Global's argument. The DTE approved the Massachusetts agreement in its entirety on June 24, 2002, but held that it was not bound by RIPUC's interpretation and reached its own interpretation. It noted that Paragraph 32 allowed the DTE to ensure that the agreement was "consistent with the laws and regulatory requirements of . . . the state for which the request is made." The DTE made note of its prior precedent -- in particular, its May 1999 order finding that the Internet Traffic Order had held that ISP traffic was interstate traffic and thus not subject to reciprocal compensation under the TCA. The DTE concluded that based on this precedent it was required to find that the Internet Traffic Order was resolution of the issue under the meaning of § 5.7.2.3. Therefore, Global was not entitled to reciprocal compensation for ISP-bound traffic during the relevant time period, between July 14, 2000 and June 14, 2001.

Global filed suit challenging the DTE ruling.[6]  Global asserted a number of claims in its complaint, including, most importantly for our review, a claim that the DTE's decision not to be bound by the RIPUC decision on the issue violated the Full Faith and Credit Clause of the U.S. Constitution.  See Global NAPs II, 332 F. Supp. 2d at 359.  The district court issued a lengthy and thoughtful decision on August 26, 2004, granting in part Global's motion for summary judgment.  Id. at 375.  The court found the RIPUC conclusion regarding the effect of the Internet Traffic Order on § 5.7.2.3 could not be relitigated before the DTE.  Id. at 345.  The court noted, however, that it was "possible that, in view of the state of the law in Rhode Island in 1999, the issue was not resolved, but, in view of the state of the law in Massachusetts, the issue was resolved."  Id. at 374.  Thus, the court remanded the case to the DTE to determine "whether and when Massachusetts state legal or equitable principles that might serve as the foundation of any obligation to pay reciprocal compensation were so well-settled that the issue was resolved within the meaning of the parties'

_____

[6]  Global also petitioned the DTE for reconsideration of its order since the court in Global NAPs I had subsequently vacated the DTE's May 1999 order, which the DTE had relied on heavily when interpreting the interconnection agreement here.  The DTE denied this petition, and Global filed a second suit seeking review of this denial.  The district court in this case allowed the joint motion of all parties to consolidate the two cases.  See Global NAPs II, 332 F. Supp. 2d at 343.

agreement through a combination of the [Internet Traffic Order] and Massachusetts state law." Id. at 345-46.

Verizon and the DTE each appealed, arguing that the district court incorrectly applied the Full Faith and Credit Clause. Global cross-appealed, claiming that the district court erred in remanding the case to the DTE rather than reversing the DTE decision outright.

We first address the question of appellate jurisdiction.

## II.

While neither party challenges jurisdiction, "[w]e have an obligation to inquire sua sponte into our jurisdiction over the matter." Doyle v. Huntress, Inc., 419 F.3d 3, 6 (1st Cir. 2005) (citing Florio v. Olson, 129 F.3d 678, 680 (1st Cir. 1997)).[7] It is clear that "the federal courts have subject matter jurisdiction to review state agency determinations under the TCA for compliance with federal law, pursuant to 28 U.S.C. § 1331." Global NAPs, Inc. v. Verizon New Eng., Inc., 396 F.3d 16, 21-22 (1st Cir. 2005). However, subject to a few exceptions not applicable here, we have appellate jurisdiction only over "final decisions" of the district courts under 28 U.S.C. § 1291. Generally, a district court order

---

[7] Shortly after Verizon and the DTE filed this appeal, we issued an Order to Show Cause directing the parties to address the issue of our appellate jurisdiction in light of the district court's remand order. In a later order, we referred the issue of appellate jurisdiction to the panel, and asked the parties to address certain jurisdictional questions in their opening briefs. Verizon and DTE responded to our request, while Global did not.

that remands to an administrative agency for further proceedings is not considered a "final decision" within the meaning of § 1291. See Mall Props., Inc. v. Marsh, 841 F.2d 440, 441-42 (1st Cir. 1988). Here we are faced with a remand order.

Verizon and the DTE argue that we nonetheless have jurisdiction over this appeal because it falls in the "category of cases in which an immediate appeal by a governmental agency is allowed . . . , because otherwise the [agency] would be unlikely to obtain review." Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 151 (1st Cir. 1989); see also Marsh, 841 F.2d at 443 (suggesting jurisdiction would be appropriate in cases where "unless review [is] accorded immediately, the agency likely would not be able to obtain review").

This court has recognized our ability to review orders remanding agency proceedings in situations similar to this one. See Colon, 877 F.2d at 151-52; United States v. Alcon Labs., 636 F.2d 876, 884-85 (1st Cir. 1981); Lopez Lopez v. Sec'y of Health, Educ. & Welfare, 512 F.2d 1155, 1156 (1st Cir. 1975).

For example, in Colon, the district court had remanded a social security disability insurance benefits case to the Secretary of Health and Human Services, ordering him to reopen an earlier decision that had denied benefits. Colon, 877 F.2d at 151. The Secretary appealed that order. We found that we had appellate jurisdiction because otherwise "the Secretary [was] unlikely to

-17-

obtain review of this important issue which is distinct from the underlying merits of the claim of disability." Id. We noted that if the Secretary decided to grant benefits on remand, it would be "doubtful whether the Secretary could then appeal from his own decision to grant benefits." Id. Even if the Secretary decided to deny benefits, "[a]rguing that the district court has no jurisdiction to order the Secretary to reopen a previous final decision after that decision, in fact, has been reopened is largely an academic exercise." Id. at 152.

Similarly, the Eleventh Circuit, in considering a TCA case, held that it had jurisdiction to consider the appeal by the Florida Public Service Commission and BellSouth of a district court's order remanding the case to the state commission:

> [T]here is a widely recognized distinction between remands where a district court simply orders the agency to proceed under a 'certain legal standard,' and in situations where a district court remands for further consideration of evidence. A remand order generally is found appealable in the former cases because the agency, forced to conform its decision to the district court's mandate, cannot appeal its own subsequent order.

MCI Telecomms. Corp. v. BellSouth Telecomms. Inc., 298 F.3d 1269, 1271 (11th Cir. 2002) (internal citation omitted) (citing Occidental Petroleum Corp. v. SEC, 873 F.2d 325, 329-30 (D.C. Cir. 1989)). Other circuits considering an appeal under the TCA challenging a district court order that had remanded to a state commission seem to have assumed they had jurisdiction sub silentio. See, e.g., Ind. Bell Tel. Co. v. McCarty, 362 F.3d 378, 382, 395

-18-

(7th Cir. 2004); Sw. Bell Tel. Co. v. Pub. Util. Comm'n, 348 F.3d 482, 485, 487 (5th Cir. 2003); US W. Commc'ns, Inc. v. Jennings, 304 F.3d 950, 959 (9th Cir. 2002); MCI Telecomm. Corp. v. Bell Atl.-Pa., 271 F.3d 491, 498, 521 (3d Cir. 2001); AT&T Commc'ns of the S. States, Inc. v. BellSouth Telecomms. Inc., 229 F.3d 457, 459 (4th Cir. 2000).

For reasons similar to those given in Colon, we hold we have appellate jurisdiction over this matter. The circumstances of this case make clear that if review is denied at this stage, the DTE will be unable to "obtain review of this important issue distinct from the underlying merits of the claim of disability," see Colon, 877 F.2d at 150, because the district court has "simply order[ed] the agency to proceed under a certain legal standard," MCI Telecomms., 298 F.3d at 1271 (internal quotation marks omitted). If on remand from the district court, the DTE were to reverse course and find that Global was due reciprocal compensation, the DTE would be unable to appeal its own order for the purpose of raising the issue raised here. Even if one of the parties appealed this hypothetical later decision, the DTE would be placed in the awkward position of challenging the district court's original decision, while simultaneously defending its subsequent order applying the district court's legal standards. Alternatively, if the DTE once again denies Global's claim for reciprocal compensation, and Global were to once again appeal this

determination, the DTE's appeal of the district court's original ruling would be "largely an academic exercise of little practical significance." See Colon, 877 F.2d at 152. In this scenario, the most salient issue on appeal would instead be whether the DTE's alternative grounds were sufficient to support its decision.

Since we have jurisdiction over DTE's appeal, we may also hear Verizon's appeal raising the same issue. See MCI Telecomms., 298 F.3d at 1271 (hearing appeal of both the state commission and a private party); NAACP v. U.S. Sugar Corp., 84 F.3d 1432, 1436 (D.C. Cir. 1996) ("[W]hat matters for the purposes of our appellate jurisdiction is whether the district court's decision -- and not any particular party challenging it -- is properly before us . . . .").

Global's cross-appeal is a different matter. Global argues that the district court erred in ordering a remand to the DTE rather than reversing the DTE's decision outright. In a nutshell, Global's argument is that the DTE is constrained by its own administrative precedent from finding that reciprocal compensation cannot be paid. These arguments go to the heart of the underlying debate between Global and Verizon, and in making these arguments Global asks us to reach issues not decided by the district court. We decline to do so, and find that Global's cross-appeal is not properly before us.

We turn now to the merits of the appeal.  The district court held:

> [A] state public utility commission's conclusions of state law relating to an interconnection agreement are entitled to preclusive effect in subsequent proceedings before other states' public utility commissions to the same extent that they would receive preclusive effect in the first state's courts.

Global NAPs II, 332 F. Supp. 2d at 366.  It implicitly held that Rhode Island law would require the DTE to be bound by the RIPUC's decision.  The district court based its decision on its view that principles of collateral estoppel, or "issue preclusion," rooted in the Full Faith and Credit Clause required such a holding.  See AVX Corp. v. Cabot Corp., No. 04-2656, slip op. at 6 (1st Cir. Sept. 13, 2005) (describing the difference between issue and claim preclusion).  We review this conclusion of federal law de novo.

The Full Faith and Credit Clause provides: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the Effect thereof." U.S. Const. art IV, § 1.  Congress, exercising its power under this provision, passed 28 U.S.C. § 1738, which provides that the "Acts, records and judicial proceedings . . . [of any State] shall have the same full faith and credit in every court within the

United States . . . as they have by law or usage in the courts of [the] State . . . from which they are taken."

There is no claim that the Full Faith and Credit Clause compels full faith and credit be given to the unreviewed decisions of state administrative agencies. And, under University of Tennessee v. Elliott, 478 U.S. 788 (1986), the statute, § 1738, does not apply to unreviewed decisions of state administrative agencies. However, Supreme Court precedent makes clear that we must determine whether application of a federal common law rule of issue preclusion is appropriate here.

To set the scene, we describe briefly the requirements of federal issue preclusion law, but do not rest on that ground. We also assume arguendo that issue preclusion applies to an unreviewed administrative agency proceeding.[8] See Bath Iron Works Corp. v. Dir., Office of Workers' Comp., 125 F.3d 18, 21 (1st Cir. 1997) ("[T]he subject [of preclusion in administrative contexts] is a

---

[8] The courts generally "favor[] application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality." Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991). This is true even "when the issue has been decided by an administrative agency, be it state or federal, which acts in a judicial capacity." Id. at 108 (citation omitted) (citing Elliott, 478 U.S. at 798); see also United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1996) ("When an administrative agency is acting in a judicial capacity and resolve[s] disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.").

-22-

complex one, with many variations; and it is perhaps well not to generalize too broadly.").[9]

In <u>Monarch Life Insurance Co.</u> v. <u>Ropes & Gray</u>, 65 F.3d 973 (1st Cir. 1995) this court set forth the following "federal preclusion principles": "(1) both the . . . proceedings involved the <u>same issue</u> of law or fact; (2) the parties <u>actually litigated</u> the issue in the [prior] proceeding[]; (3) the [first] court <u>actually resolved</u> the issue in a final and binding judgment . . . ; and (4) its resolution of that issue of law or fact was <u>essential</u> to its judgment (i.e., necessary to its holding)." <u>Id.</u> at 978 (emphases in original); <u>see also</u> <u>In re Bankvest Capital Corp.</u>, 375 F.3d 51, 70 (1st Cir. 2004). We have serious doubts about whether this test could be met on the facts presented here, because it is not at all clear that the RIPUC and the DTE decided "the same issue of law or fact."[10] The RIPUC here came to the conclusion that

_____

[9] <u>See</u> <u>also</u> 18B C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> § 4475, at 474-75 (2d ed. 2002) ("Preclusion is much less likely to attach when a proceeding in one agency is followed by a proceeding in another agency. . . . When the agencies are creatures of different governments, all of the principles that generally prevent one government from precluding another are at work.").

[10] There is considerable debate among the parties as to whether the "issue" decided by the RIPUC was one of fact, law, or a mixed question of fact or law. Verizon and the DTE argue that issue preclusion is inappropriate when the issue decided by the first state administrative agency was one of law rather than fact. <u>See</u> <u>Edmunson</u> v. <u>Borough of Kennett Square</u>, 4 F.3d 186, 193 (3d Cir. 1993). Global argues that the issue is one of fact and so <u>Edmunson</u> is inapposite, and in the alternative, that even if the issue were one of law, issue preclusion should apply. The district court came

-23-

federal law (<u>viz</u>, the <u>Internet Traffic Order</u>) did not "resolve" the issue within the meaning of the parties' Rhode Island agreement, relying at least in part on the fact that the question of reciprocal compensation was still open in Rhode Island. The DTE, in contrast, found that the <u>Internet Traffic Order</u> did resolve the issue, but based its finding on its "well established position on the issue of reciprocal compensation." Indeed, as of May 1999, after the <u>Internet Traffic Order</u> had "liberat[ed]" it from its earlier assumption that federal law required reciprocal compensation, the DTE had come to a settled conclusion that reciprocal compensation was not required.[11]

It is against the backdrop of its May 1999 order that the DTE decided the present question of whether the FCC's <u>Internet Traffic Order</u> "resolved" the issue of reciprocal compensation for ISP-bound traffic. No similar "well-established position" guided

_____

to the conclusion that the RIPUC decided an issue of law, but held that issue preclusion was required. <u>Global NAPs II</u>, 332 F. Supp. 2d at 366 (citing <u>Miller</u> v. <u>County of Santa Cruz</u>, 39 F.3d 1030, 1037 & n.7 (9th Cir. 1994)). We do not resolve the parties' disagreement about whether the DTE ruling is one of law or of fact or of mixed law and fact.

[11] The fact that the DTE's May 1999 order was subsequently vacated and remanded in <u>Global NAPs I</u>, is of no import. The district court in <u>Global NAPs I</u> simply remanded to the agency to consider whether reciprocal compensation would be required under state contractual or equitable principles. The DTE concluded that compensation would not be required, and this decision was upheld upon review by the Supreme Judicial Court of Massachusetts. <u>See</u> <u>MCI WorldCom Commc'ns, Inc.</u> v. <u>Dep't of Telecomms. and Energy</u>, 810 N.E.2d 802, 812 (Mass. 2004).

the RIPUC in making its decision.  It is difficult, then, to see for preclusion purposes why the DTE and RIPUC decided the "same issue of law or fact."  See 18C C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4425, at 659 (2d ed. 2002) ("Preclusion . . . may be defeated by showing . . . that there has been a substantial change in the legal climate suggesting a new understanding of the governing legal rules that may require a different application.").[12]

Nonetheless, we do not rest on this ground because there is of necessity a prior analysis.  As the Supreme Court made clear in Elliott, we must first answer the preliminary question of whether application of a federal common law rule of issue preclusion would be consistent with Congress's intent in enacting the TCA.  Elliott, 478 U.S. at 796; see also Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 110 (1991).  We find that, on the facts of this case, it would not.

Elliott controls the structure of analysis.  In Elliott, a discharged employee of the university had filed a complaint with a state administrative agency, claiming his discharge was racially

---

[12] Courts should be particularly cautious about enforcing issue preclusion rules across state lines because in contrast to the rules of claim preclusion, "[m]any issue preclusion rules fall far outside the central role of judicial finality."  18B C. Wright, A. Miller & E. Cooper, supra, § 4467, at 42.  There are many situations where full faith and credit does not compel issue preclusion rules to be applied in the second state.  Id. § 4467, at 42-43.

motivated. 478 U.S. at 790. When his claims were denied by the state agency, rather than seeking review in the state courts, the employee went to federal district court with claims under Title VII of the Civil Rights Act of 1964, the Constitution, and the Reconstruction-era civil rights statutes. Id. The district court granted summary judgment for the university on the ground that the state administrative decision was entitled to preclusive effect. Id. at 792. The Supreme Court noted first that the full faith and credit statute, 28 U.S.C. § 1738, did not apply to unreviewed administrative factfinding. Id. at 794. As a result, the Court had to "fashion federal common-law rules of preclusion in the absence of a governing statute." Id. It determined that, with respect to the employee's Title VII claim, the question of whether the state administrative decision was entitled to preclusive effect depended on "whether a common-law rule of preclusion would be consistent with Congress'[s] intent in enacting Title VII." Id. at 796. The Court concluded based on the language and legislative history of Title VII that "Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims." Id.; see also Solimino, 501 U.S. at 112-13 (holding that unreviewed findings of a state administrative agency with respect to an age discrimination claim had no preclusive effect on federal proceedings under the Age Discrimination in Employment Act). In

resolving the present dispute, we ask the same question as to congressional intent in enacting the TCA.

The district court distinguished <u>Elliott</u> and <u>Solimino</u> because "[a]s they involved decisions to be made by the federal government, rather than a state, they were governed by the common law of issue preclusion rather than the Full Faith and Credit Clause." <u>Id.</u> at 366. However, there is nothing in those cases to suggest that their holdings on the preclusive reach of judicially unreviewed decisions of state agencies were limited to situations where the subsequent case was in federal court.

In order to find that issue preclusion applies, the district court held that "there is nothing explicit or implicit in the [TCA] that indicates that Congress intended to depart from the traditional rules of preclusion." <u>Id.</u> We disagree. Our examination of the TCA leads us to conclude that to apply principles of issue preclusion, at least in the situation presented here, would contravene the intent of Congress.

In a sense, issue preclusion rules are about allocation of authority to decide a question. General application of the federal common law of issue preclusion would threaten two different allocations of power under the TCA: the allocation among the commissions of each state as to the effectuation of their state's policies and the allocation of power between the FCC and the states.

The model under the TCA is to divide authority among the FCC and the state commissions in an unusual regime of "cooperative federalism," see P.R. Tel. Co. v. Telecomms. Regulatory Bd., 189 F.3d 1, 8 (1st Cir. 1999), with the intended effect of leaving state commissions free, where warranted, to reflect the policy choices made by their states. See P. Huber et al., Federal Telecommunications Law §§ 3.3.3-3.3.4 (2d ed. 1999). Rather than placing the entire scope of regulatory authority in the federal government, "Congress enlisted the aid of state public utility commissions to ensure that local competition was implemented fairly and with due regard to the local conditions and the particular historical circumstances of local regulation under the prior regime." Id. § 3.3.4, at 227. We see little indication that Congress intended its explicit allocation of authority between state commissions to be generally displaced by common law rules that themselves allocate authority.

The goal of preserving a role for the state regulatory commissions is reflected in a number of provisions in the TCA. Congress expressly left with the states the power to enforce "any regulation, order, or policy of a State commission that . . . establishes access and interconnection obligations of local exchange carriers; . . . is consistent with the requirements of this section; and . . . does not substantially prevent implementation of the requirements of this section and the purposes

of this part." 47 U.S.C. § 251(d)(3). While the TCA prevents states and localities from passing laws "hav[ing] the effect of prohibiting the ability of any entity to provide interstate or intrastate telecommunications service," id. § 253(a), it allows "a State to impose, on a competitively neutral basis . . . , requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers," id. § 253(b).

The role played by state commissions is especially important with respect to interconnection agreements. State commissions are given the authority to resolve though arbitration or mediation any open issues in ongoing negotiations for interconnection agreements. Id. § 252(a)(2). Before an interconnection agreement goes into effect, it must be approved by a state commission, which may reject the agreement if it "is not consistent with the public interest, convenience, and necessity" or it "discriminates against a telecommunications carrier not a party to the agreement." Id. § 252(e)(2). Congress expressly preserved each state's authority to "establish[] or enforc[e] other requirements of State law in [a State commission's] review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements" as

long as those requirements do not serve as barriers to entry.  Id. § 252(e)(3).

In addition to threatening the allocation of authority under the TCA among the states as to protection of their own state interests, general implementation of default common law issue preclusion rules could threaten the authority allocated to the FCC. Congress gave the federal government an extensive oversight role. Under the TCA, the FCC has authority to preempt state jurisdiction over regulation of intrastate communications in a number of specific situations.  For example, if a state commission fails to carry out the duties required of it with respect to its consideration of a particular interconnection agreement, the FCC is given authority to preempt the state commission's jurisdiction and assume direct responsibility for that agreement.  Id. § 252(e)(5). Direct review of the state commission's failure to act is foreclosed; the FCC's actions in response to an alleged failure to act, and judicial review of those actions, are the "exclusive remedies." Id. § 252(e)(6).  In addition, the FCC may preempt the enforcement of a state or local law if it finds, after notice and an opportunity for comment, that the law acts as a barrier to entry.  Id. § 253(e).  In addition to these specific grants of authority, the FCC has broad regulatory authority over the TCA. See id. § 201(b) ("The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out

the provisions of this chapter."); <u>AT&T Corp.</u> v. <u>Iowa Utils. Bd.</u>, 525 U.S. 366, 378 (1999) (interpreting § 201 to extend to the local competition provisions of the TCA).

Indeed, the FCC has issued its own orders and regulations that have made clear that, at times, individual state commissions are to decide matters and that, at other times, one state commission's determination is owed some deference. The FCC, in exercising the power granted to it under the TCA, has indicated that the DTE is the decision-making authority as to the issue here. In Paragraph 32, the FCC noted that the adoption of an interconnection agreement from another state was subject to the proviso that the agreement had to be "consistent with the laws and regulatory requirements of . . . the state for which the request is made." <u>Merger Order</u>, 15 F.C.C.R. 14032 app. D at 14310. In considering the agreement here, the FCC reiterated that under the terms of Paragraph 32 "only the relevant state commission may ultimately decide whether particular terms of the agreement should be adopted in that state, and if so, what those terms mean." <u>Paragraph 32 Order</u>, 17 F.C.C.R. at 4039.

As a result of these orders, the FCC has essentially done three things. It has said that nothing in the TCA itself requires as a matter of federal law that Verizon pay the reciprocal compensation charges. It has also said that each state commission may make its own determination on the issue under state law. And

although the FCC required Verizon to enter an agreement with Global using the same language as the Rhode Island agreement, it also recognized that there was a dispute about that language and that the relevant state commission (the DTE) should decide the issue.

For a court to step in and shift the state-by-state decision-making authority from the Massachusetts DTE to the RIPUC on this issue would upset the allocations of authority made out under the TCA. A judicially imposed rule of preclusion here would also set up an opportunity for regulatory arbitrage contrary to the purposes of the TCA. It is common in the telecommunications world for ILECs and CLECs to negotiate multiple interconnection agreements across multiple states simultaneously, and these agreements often contain identical terms. Given this fact, a rule granting preclusive effect to the decision of the first state commission on a particular issue creates the risk of perverse incentives. Carriers looking to lock in a friendly interpretation will race to the state commission with the most amenable views, and perhaps leverage that decision to their advantage in other states. The state commissions themselves would be encouraged to decide an issue as quickly as possible, to preserve their independence and to avoid being bound by another state agency's interpretations of contractual terms. These results cut directly against Congress's desire, as evinced by the text and structure of the TCA, "to ensure that local competition [be] implemented fairly and with due regard

to the local conditions and the particular historical circumstances of local regulation under the prior regime." P. Huber et al., supra, § 3.3.4, at 227.

To be sure, in some other circumstances, deference by one state commission to another state's conclusions may be appropriate. For example, the FCC has chosen to give presumptive effect to certain findings regarding technical feasibility by one state commission. See 47 C.F.R. § 51.319(b)(3)(ii) ("Once one state commission has determined that it is technically feasible to unbundle subloops at a designated point, an incumbent LEC in any state shall have the burden of demonstrating to the state commission . . . that it is not technically feasible . . . to unbundle its own loops at such a point."); id. § 51.230(c) ("Upon a successful demonstration by [a competing] carrier before a particular state commission [that 'deployment of a technology falls within the presumption under paragraph (a)(3) of this section'], the deployed technology shall be presumed acceptable for deployment in other areas."). This presumption operates not because of the law of issue preclusion but because the FCC has chosen this as an appropriate method of achieving uniformity. The FCC has not created any similar presumptions as to the issues presented here.

In part because of the complications of the TCA's scheme of cooperative federalism, we do not think it wise to decide this case in the broad terms urged by the parties. We do not address

whether the enactment of the TCA itself displaced <u>all</u> aspects of the federal common law of issue preclusion in the area. Nor do we address the extent to which the TCA assigns the task of displacement or adoption of rules of issue preclusion to the FCC. We also do not resolve the dispute as to whether interconnection agreements are creatures of state law or federal law. Rather, we simply find that under the circumstances presented here, application of common law principles of issue preclusion would contravene the intent of Congress. The district court was in error when it held otherwise.

**IV.**

We <u>reverse</u> the district court's judgment and <u>vacate</u> the order remanding the matter to the DTE; we <u>remand</u> to the district court for further proceedings consistent with this opinion. Costs are awarded to Verizon and the DTE.