# United States Court of Appeals
## For the First Circuit

No. 05-2657

GLOBAL NAPS, INC.,

Plaintiff, Appellant,

v.

VERIZON NEW ENGLAND, INC., d/b/a Verizon Massachusetts;
MASSACHUSETTS DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY;
PAUL B. VASINGTON, in his capacity as Commissioner;
JAMES CONNELLY, in his capacity as Commissioner;
W. ROBERT KEATING, in his capacity as Commissioner;
DEIRDRE K. MANNING, in her capacity as Commissioner;
EUGENE J. SULLIVAN, JR., in his capacity as Commissioner,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Howard, Circuit Judge.

Andrew Good, with whom Philip G. Cormier, Good & Cormier, William J. Rooney, and Jeffrey Melick were on brief, for Global NAPs, Inc.
Scott H. Angstreich, with whom Bruce P. Beausejour, Keefe B. Clemons, Sean A. Lev, and Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C. were on brief, for Verizon New England, Inc.
Thomas A. Barnico, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, and Daniel J. Hammond,

Assistant Attorney General, were on brief, for the Massachusetts Department of Telecommunications and Energy and its Commissioners.
     Joel Marcus, Counsel, Samuel L. Feder, General Counsel, and Daniel M. Armstrong, Associate General Counsel, on brief for the Federal Communications Commission, amicus curiae.

———————————————

April 11, 2006

———————————————

**LYNCH**, **Circuit Judge**.  The Massachusetts Department of Telecommunications and Energy (DTE), acting as an arbitrator of a dispute over an interconnection agreement between Verizon New England, Inc. and Global NAPs, Inc., issued an order requiring Global NAPs to pay Verizon compensation for certain phone calls; the amount Global NAPs owes is at least $42 million.  The question before the DTE involved a particular variant on a larger question of allocation of compensation for telephone calls placed to internet service providers (ISPs).  The larger question has been addressed in a series of orders from the Federal Communications Commission (FCC).  At the heart of this case is one such order, the ISP Remand Order.

The DTE, in an arbitration order, required Global NAPs to pay Verizon access charges for all "virtual NXX" traffic, including non-local ISP-bound traffic, rejecting Global NAPs' argument that state commissions were preempted by the ISP Remand Order from regulating intercarrier compensation for all ISP-bound traffic.  Global NAPs filed suit challenging the DTE's conclusion in federal district court.  Verizon and the DTE argued that the DTE retained authority to decide the issue because the FCC order only preempted state commission regulation of "local" traffic sent to an ISP, and the FCC did not hold that virtual NXX traffic is such local traffic.

-3-

The district court never reached the preemption issue, because it found that Global NAPs had implicitly consented to the "jurisdiction" of the DTE to resolve the dispute, and so could not later challenge the DTE's jurisdiction to impose access charges for ISP-bound traffic.  It granted Verizon and the DTE's motions for partial summary judgment.  No party on appeal agrees with that reasoning.

In the end, we affirm, though on different grounds.  A party contesting an issue of whether federal law has preempted a state commission's authority does not waive judicial review of the argument by first presenting it to the commission in the course of an arbitration under the Telecommunications Act of 1996.  Because the preemption question was not waived, it must be addressed.  The issue is one of federal law over which the federal court exercises de novo, not deferential, review.  We reach the merits and hold that the FCC did not expressly preempt state regulation of intercarrier compensation for non-local ISP-bound calls as are involved here, leaving the DTE free to impose access charges for such calls under state law.

**I.**

Regulatory Background

Prior history between these parties is set forth in our opinions in Global NAPs, Inc. v. Verizon New England, Inc. (Global NAPs I), 396 F.3d 16 (1st Cir. 2005), and Global NAPs, Inc. v.

Massachusetts Department of Telecommunications & Energy (Global NAPs II), 427 F.3d 34 (1st Cir. 2005).

The Telecommunications Act of 1996 (TCA), Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.), was enacted "to end the local telephone monopolies and create a national telecommunications policy that strongly favored competition in local telephone markets." Global NAPs I, 396 F.3d at 18; P.R. Tel. Co. v. Telecomms. Regulatory Bd., 189 F.3d 1, 7 (1st Cir. 1999); see also Verizon Md. Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 638 (2002); AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999). To achieve this goal, the TCA requires the former local phone monopolies, called incumbent local exchange carriers (ILECs), to allow competitive local exchange carriers (CLECs) to interconnect with their networks. See 47 U.S.C. § 251(c)(2). Interconnection permits customers of one local exchange carrier to make calls to, and receive calls from, customers of other local exchange carriers. Global NAPs II, 427 F.3d at 36. The TCA also requires the ILECs to negotiate in good faith the terms of interconnection agreements with the CLECs. See 47 U.S.C. § 251(c)(1). "These agreements provide the terms of interconnection and 'fulfill the duties' enumerated in § 251." Global NAPs II, 427 F.3d at 37 (quoting 47 U.S.C. § 251(c)(1)).

Section 252 prescribes the process by which interconnection agreements are to be formed. 47 U.S.C. § 252.

-5-

Under this provision, if negotiations between local exchange carriers do not result in a final agreement, either party can petition the relevant state commission to arbitrate unresolved issues. See id. § 252(b)(1). The state commission must limit its consideration of the agreement to the matters specifically presented in the petition for arbitration and in the response. See id. § 252(b)(4)(A). The state commission has "the authority to decide the open issues between the parties, and to impose conditions on the parties for the implementation of the terms of arbitration into an agreement," Global NAPs I, 396 F.3d at 19 (citing 47 U.S.C. § 252(b)(4)(C)), so long as its resolutions are consistent with § 251 and any regulations promulgated by the FCC, see 47 U.S.C. §§ 252(c)(1), 253(a). Once an agreement is concluded, it is submitted to the state commission for final approval. Id. § 252(e).

State commission decisions are subject to judicial review in federal court under 47 U.S.C. § 252(e)(6):

> In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

A.        Reciprocal Compensation and Access Charges

        The underlying issue on appeal is whether, as Global NAPs argues, the FCC's ISP Remand Order preempted state commissions from

regulating intercarrier compensation for all ISP-bound calls. Verizon and the DTE take the position that the FCC only expressly preempted state regulation of intercarrier compensation for "local" ISP-bound calls. This issue requires a brief discussion of the distinction between local and "interexchange" calling and the different mechanisms of intercarrier compensation that apply to them.

The FCC and the DTE have maintained a distinction between "local" and "interexchange" traffic. See Local Competition Provisions in the Telecommunications Act of 1996 (Local Competition Order) ¶¶ 1033-35, 11 F.C.C.R. 15499, 16012-14 (1996) (drawing the distinction). Local traffic stays within the boundaries of a local calling area. Interexchange (or "non-local") traffic crosses the boundaries of a local calling area and is generally subject to toll or long-distance charges paid by the calling party.[1] Traditionally, local calling areas have been geographically defined.

---

[1] Interexchange traffic consists of so-called "local toll" calls, which cross the boundaries of local calling areas but remain within a local access and transport area (LATA), and "long distance" calls, which cross the boundaries of LATAs. See SBC Commc'ns Inc. v. FCC, 407 F.3d 1223, 1227 (D.C. Cir. 2005) ("IntraLATA service is what consumers generally know as local service; intraLATA 'toll' calls, however, encompass those long-distance calls that do not travel beyond the borders of a single LATA."); SBC Commc'ns, Inc. v. FCC, 154 F.3d 226, 231 n.3 (5th Cir 1998); Mich. Bell Tel. Co. v. Chapelle, 222 F. Supp. 2d 905, 909 n.6 (E.D. Mich. 2002).

-7-

Intercarrier compensation comes into play whenever two or more carriers collaborate to complete a phone call. Whether a call is "local" or "interexchange" generally makes a difference in what regime of intercarrier compensation -- reciprocal compensation or access charges -- applies to that call.

The TCA requires interconnecting local exchange carriers (LECs) to establish "reciprocal compensation arrangements," 47 U.S.C. § 251(b)(5), under which the originating LEC compensates the terminating LEC for the transport and termination of telecommunications traffic. See Global NAPs II, 427 F.3d at 36 (citing 47 C.F.R. § 51.701). The FCC, in its initial regulations implementing the TCA, limited reciprocal compensation obligations "to [telecommunications] traffic that originates and terminates within a local area," leaving interexchange calls outside the reciprocal compensation regime. See Local Competition Order ¶ 1034, 11 F.C.C.R at 16013; see also Global NAPs II, 427 F.3d at 36-37.

In those regulations, the FCC made clear that it was leaving in place the pre-existing access charge regime that applied to interexchange calls:

> [A]s a legal matter, . . . transport and termination of local traffic are different services than access service for long distance telecommunications. . . . The [TCA] preserves the legal distinctions between charges for transport and termination of local traffic and interstate and intrastate charges for terminating long-distance traffic.

-8-

Local Competition Order ¶ 1033, 11 F.C.C.R. at 16012-13; see also id. ¶ 1035, 11 F.C.C.R. at 16013 ("Traffic originating or terminating outside of the applicable local area would be subject to interstate and intrastate access charges.").

Importantly, the FCC's initial TCA regulations also reaffirmed the ability of states to regulate intrastate access charges. As a result, Verizon's intrastate access charge tariffs for all phone calls are approved by the DTE.

In its initial TCA regulations, the FCC also left with the state commissions the power to define local calling areas "consistent with [their] historical practice of defining local service areas for wireline LECs," and decided that the states should "determine whether intrastate transport and termination of traffic between competing LECs, where a portion of their local service areas are not the same, should be governed by section 251(b)(5)'s reciprocal compensation obligations or whether intrastate access charges should apply to the portions of their local service areas that are different." Id. ¶ 1035, 11 F.C.C.R. at 16013.

B.      Global NAPs' VNXX System

Under the traditional system for rating calls, whether a call is "local" or "interexchange" depends on geographically defined local calling areas. The DTE established the existing geographic local calling area structure for Massachusetts after a

generic proceeding "in which all interested Parties had the opportunity to comment." Verizon implements this system by comparing the "NXX" numbers (the "NXX" is the middle three digits of a ten-digit phone number) of the caller and the recipient. The "NXX" has generally been associated with a particular "switch" (that is, the equipment that routes phone calls to their destination) physically located within a local calling area; NXXs have thus served as proxies for geographic location. This means that if the NXX numbers of the caller and the recipient were within the same local calling area, one could assume that the caller and recipient were actually physically within the same calling area and bill the call as a local call.

Global NAPs has the ability to assign its customers "virtual" NXXs (VNXX), so that a Global NAPs customer can be given VNXX numbers that are different than those that would normally be assigned to him based on his physical location. This allows a party to call what appears to be a "local" number, although behind the scenes that call is actually routed to a different local calling area. When the party making such a call is a Verizon customer, the call is transmitted outside the local calling area by Verizon.

Many of Global NAPs' ISP customers use VNXX arrangements, and many of these ISPs' end-user customers use Verizon for local phone service. To access the Internet, the end-user dials in to a

-10-

VNXX number assigned to his or her own local calling area.  Then, Verizon transports the call across local calling areas to Global NAPs' point of interconnection with the Verizon network.  Global NAPs and Verizon agree that "[u]nder VNXX arrangements, the Verizon end user's call to the ISP's server is toll-free [to the end user] whether or not the ISP's server is located in the same local exchange area in which the end-user originates the call." (emphasis added).

C.         The ISP Traffic Debate

The treatment of intercarrier compensation for ISP-bound traffic has been a matter of considerable debate in recent years. Calls to ISPs tend to be long, and generally go exclusively from the ISP customer to the ISP.  This has created opportunities for regulatory arbitrage.  For example, in the context of reciprocal compensation, since reciprocal compensation flows from the LEC whose customer makes the phone call to the LEC whose customer receives the phone call, an LEC with a high proportion of ISP customers -- as Global NAPs has -- stands to gain a windfall in a reciprocal compensation scheme which includes traffic to an ISP. See Global NAPs II, 427 F.3d at 37 (citing Bell Atl. Tel. Cos. v. FCC, 206 F.3d 1, 2-3 (D.C. Cir. 2000)).[2]

_____

[2] Global NAPs II involved the question of whether the interpretation of a provision of an interconnection agreement by one state commission precluded a different interpretation by another state commission of an identically worded provision. 427 F.3d at 48-49.  That case involved a different interconnection

-11-

The FCC has issued several orders related to intercarrier compensation for ISP-bound traffic. In 1999, the FCC ruled that ISP-bound traffic was not subject to reciprocal compensation obligations under 47 U.S.C. § 251, although it left to state commissions the ability to conclude "pursuant to contractual principles or other legal or equitable considerations, that reciprocal compensation is an appropriate interim . . . rule" pending final FCC rulemaking on the matter. Local Competition Provisions in the Telecomms. Act of 1996 (Internet Traffic Order) ¶¶ 26, 27, 14 F.C.C.R. 3689, 3705-06 (1999).

The D.C. Circuit vacated the Internet Traffic Order on March 24, 2000 and remanded to the FCC, "finding that the FCC's rationale for treating ISP-bound traffic as interstate traffic for the purposes of reciprocal compensation was inadequate." Global NAPs II, 427 F.3d at 39 (citing Bell Atl. Tel. Cos., 206 F.3d at 9). On April 27, 2001, the FCC issued an order in response to the D.C. Circuit's remand, holding once again that the "provisions of section 251(b)(5) do not extend to ISP-bound traffic" but resting its decision on a different legal ground. Local Competition Provisions in the Telecomms. Act of 1996 (ISP Remand Order) ¶ 1-2, 16 F.C.C.R. 9151, 9153 (2001). The FCC also provided an interim intercarrier compensation regime for at least some ISP-bound traffic to supplant existing state regimes going forward. This

---

agreement than that at issue here. See id. at 36 n.1.

-12-

interim regime was meant to limit opportunities for regulatory arbitrage. It is undisputed that this interim regime preempts state commission regulation of intercarrier compensation for local ISP-bound calls. The question here is whether the preemptive effect extends to the interexchange ISP-bound calls at issue here.

The D.C. Circuit held that the FCC's new legal grounds as expressed in the ISP Remand Order were still inadequate. See WorldCom, Inc. v. FCC, 288 F.3d 429, 433-34 (D.C. Cir. 2002). However, it chose not to vacate the FCC order, and so the ISP Remand Order remains in force. See Global NAPs II, 427 F.3d at 40 (citing WorldCom, Inc., 288 F.3d at 434; Verizon Md. Inc. v. Global NAPs, Inc., 377 F.3d 355, 367 (4th Cir. 2004)).

Simultaneously to the release of the ISP Remand Order, the FCC issued a notice of proposed rulemaking to consider whether it should reconsider the system of intercarrier compensation for all calls, including calls to ISPs. See Developing a Unified Intercarrier Compensation Regime (Intercarrier Compensation NPRM), 16 F.C.C.R. 9610 (2001); see also Developing a Unified Intercarrier Compensation Regime (Intercarrier Compensation FNPRM), 20 F.C.C.R. 4685 (2005) (further notice of proposed rulemaking).

## II.

### Procedural History

Verizon and Global NAPs began the negotiation process for a new interconnection agreement in 2002. Global NAPs I, 396 F.3d

-13-

at 19-20.  On July 30, 2002, Global NAPs filed a petition for arbitration with the DTE for resolution of a number of open disputes concerning the proposed interconnection agreement, id. at 20, including whether VNXX calls should be treated as local or interexchange for purposes of intercarrier compensation.  Included with this petition was a marked-up version of the interconnection agreement, reflecting Global NAPs' proposed changes.  Verizon filed its response to Global NAPs' petition on August 22, 2002, including its own marked-up version of the interconnection agreement.  The parties filed direct testimony with the DTE on September 10, 2002.  An evidentiary hearing was held on October 9, 2002, and the parties submitted briefs on October 21, 28, and 30, 2002.

With respect to the VNXX issue, Global NAPs argued that allowing Verizon to impose access charges on such calls would thwart technological advances.  Indeed, Global NAPs argued that VNXX traffic should be treated as local traffic, and therefore be subject to the state reciprocal compensation regime or, to the extent the traffic was ISP-bound, the federal interim compensation regime.  As detailed below, during the course of the administrative proceedings Global NAPs also made clear its position that the ISP Remand Order had preempted the DTE's authority to regulate intercarrier compensation for all ISP-bound traffic, while leaving in place the DTE's ability to regulate intercarrier compensation for other intrastate calls.

-14-

Verizon argued that the entire VNXX system was simply a way for Global NAPs to engage in regulatory arbitrage. In effect, Verizon argued, Global NAPs' VNXX system was a way to provide toll-free services to Verizon customers (so that Verizon would not get any fees from those customers), deprive Verizon of the access fees it would normally get for toll-free calls, and instead require Verizon to pay Global NAPs reciprocal compensation.

The DTE issued an order on December 12, 2002, resolving all open issues. With respect to the VNXX issue, the DTE rejected Global NAPs' position that all VNXX calls be treated as local for intercarrier compensation purposes. It found Global NAPs' position would create "considerable market distortion based on an implicit Verizon subsidy of [Global NAPs'] operations." Instead, the DTE decided that "VNXX calls will be rated as local or toll based on the geographic end points of the call." It further found that Verizon's proposal to have the parties collaborate to determine the geographic end points of VNXX calls was "an acceptable starting point," and ordered the parties to submit contract language with the final agreement to implement Verizon's solution.

The DTE also rejected Global NAPs' arguments based on the ISP Remand Order, finding that the order "explicitly recognized that intrastate access regimes in place prior to the Act remain unchanged until further state commission action" and "continues to recognize that calls that travel to points beyond the local

-15-

exchange are access calls." The DTE expressed its intent to continue enforcement of the existing intrastate access charge regime.

The DTE ordered the parties to incorporate the arbitrated terms into a final interconnection agreement by January 2, 2003; this deadline was later extended to January 17, 2003 on the parties' joint motion. Global NAPs I, 396 F.3d at 20 After the DTE issued its December 12 order, the parties began negotiating final terms of interconnection. However, on January 9, 2003, Global NAPs informed Verizon that it refused to negotiate any further. Instead, it attempted to adopt the terms of a different agreement between Verizon and Sprint.[3] Id.

Verizon responded on January 17, 2003 by filing a motion for approval of a final arbitrated agreement, attaching a proposed final agreement. Id. This agreement contained the following provision, § 7.3.8, to deal with the VNXX compensation issue: "[Global NAPs] shall pay Verizon's originating access charges for all [VNXX] Traffic originated by a Verizon Customer, and [Global NAPs] shall pay Verizon's terminating access charges for all [VNXX] traffic originated by a [Global NAPs] customer." It is this provision of the agreement that Global NAPs challenges, to the

---

[3] "[T]he TCA requires ILECs to allow any requesting CLEC to adopt the terms and conditions of any interconnection agreement it has with any other CLEC, provided that agreement has been approved by the requisite state telecommunications commission." Global NAPs I, 396 F.3d at 19 (citing 47 U.S.C. § 252(i)).

-16-

extent that it requires payment of access charges for ISP-bound traffic.

In a February 19, 2003 order, the DTE rebuffed Global NAPs' attempt to opt into the Verizon-Sprint agreement. Id. It approved Verizon's proposed final agreement and ordered the parties to sign and file that agreement. The parties eventually[4] filed a final agreement on March 18, 2003, including § 7.3.8, and it is the agreement currently in effect between the parties.

In the meantime, on December 30, 2002, Global NAPs brought an action in federal district court challenging the merits of the DTE's arbitration determination. Global NAPs I, 396 F.3d at 20. In its complaint, Global NAPs asserted that the DTE "lacked jurisdiction to impose access charges on ISP bound traffic." It also complained that the DTE's reasoning, at least with respect to ISP-bound traffic, was "wholly at odds with the ISP Remand Order."[5] The February 19, 2003 ruling by the DTE rejecting Global NAPs' attempt to opt in to the Sprint-Verizon agreement led Global NAPs to file a second action in district court, on March 3, 2003.

_____

[4] On March 14, 2003, the DTE, noting that the Global NAPs had still not complied with its February 19, 2003 order, directed the parties to file a fully executed interconnection agreement.

[5] In its complaint, Global NAPs challenged a number of other determinations made by the DTE, including the imposition of transport costs on Global NAPs and the rejection of Global NAPs' proposal to expand local calling areas. On October 28, 2005, after the district court's summary judgment decision leading to this appeal, Global NAPs stipulated to the dismissal with prejudice of its remaining challenges to the DTE's decision.

-17-

On March 11, 2003, Global NAPs, Verizon and the DTE moved to consolidate Global NAPs' two federal actions, and asked the district court to first resolve the question of whether Global NAPs was permitted to opt in to the Sprint-Verizon agreement before ruling on the challenge to the arbitration agreement. On May 12, 2004, the district court affirmed the DTE's decision not to allow Global NAPs to opt in to the Sprint-Verizon agreement. Global NAPs I, 396 F.3d at 21. On January 19, 2005, in Global NAPs I, we affirmed that judgment. Id. at 28.

Global NAPs then revived its challenge to the DTE's December 12, 2002 arbitration order by filing a motion for partial summary judgment in the district court on May 20, 2005.[6] Global NAPs argued that in the ISP Remand Order, "[t]he FCC expressed in unambiguous language its intention to assert exclusive jurisdiction over intercarrier compensation for ISP-bound traffic." Thus, it argued, the DTE lacked the authority to require Global NAPs to enter into an interconnection agreement that included § 7.3.8, which required Global NAPs pay Verizon access charges for all VNXX

---

[6] After this court's opinion in Global NAPs I, Verizon demanded that Global NAPs pay the accrued access charges that Global NAPs had failed to pay during the pendency of litigation. As of February 2005, according to Verizon, Global NAPs had accrued more than $42 million in unpaid access charges. Verizon threatened to cut off service to Global NAPs if payment was not made. Global NAPs filed for a preliminary injunction in the district court, and the district court granted that request, on the condition that Global NAPs post a $1 million bond, and expedited the briefing schedule for the parties' cross-motions for summary judgment.

traffic, including traffic bound for ISPs.[7]  Global NAPs based its

preemption argument solely on the FCC's ISP Remand Order.

Verizon and the DTE filed motions for partial summary

judgment in response, arguing that the ISP Remand Order did not

preempt the DTE from imposing access charges for non-local ISP-

bound traffic, but dealt only with the narrow issue of reciprocal

compensation for ISP-bound calls within a local calling area.

On September 21, 2005, the district court granted Verizon

and the DTE's motions for partial summary judgment.  The district

court correctly noted that it was "unclear" whether the ISP Remand

Order preempted state commissions from imposing access charges on

all ISP-bound traffic.  But it did not reach the merits of that

question; it held that since Global NAPs "voluntarily sought

arbitration by DTE after the FCC issued the ISP Remand Order and

thus impliedly consented to DTE's jurisdiction over its petition,

it may not now challenge DTE's authority on the basis of unsettled

law in order to avoid the consequences of its own business

strategy."

Global NAPs appeals, arguing (1) that it did not waive

any claim regarding the preemptive effect of the FCC's ISP Remand

---

[7] Global NAPs argued that its petition for arbitration did not raise the issue of whether access charges could be imposed on ISP-bound traffic, and so, under 47 U.S.C. § 252(b)(4)(A), the DTE could not decide the issue.  The district court rejected this argument, finding that it was sufficient that Global NAPs had raised the issue of access charges for VNXX traffic generally to the DTE.  Global NAPs does not press this argument on appeal.

Order or impliedly consent to the DTE's authority to decide the issue which had been preempted by the ISP Remand Order, and so the district court erred in not reaching the merits of its claim; and (2) that this court should reach the merits and find that the ISP Remand Order preempts the DTE from imposing access charges for ISP-bound traffic.[8]

## III.

### The District Court's "Jurisdictional" Holding

The district court's conclusion that Global NAPs could not obtain review of the DTE's preemption decision, because Global NAPs had "impliedly consented to the DTE's jurisdiction over its petition," was error. The issue of preemption was squarely presented to the DTE, the DTE decided this issue of federal law, and Global NAPs challenged that decision before the district court. The district court should have reviewed the DTE's conclusion, as it would any other conclusion of federal law by a state commission.

Global NAPs admits that in its petition for arbitration, it did not explicitly spell out its views with respect to

---

[8] On November 1, 2005, Global NAPs moved this court to issue a preliminary injunction to stop Verizon from cutting off service pending appeal. On November 2, 2005, we issued an order enjoining Verizon from cutting off service to Global NAPs, conditioned on Global NAPs' payment of additional security in an amount determined by the district court, and expedited our review. The district court, on November 9, 2005, entered an order requiring $15 million in additional security, which Global NAPs posted on November 14, 2005.

intercarrier compensation for ISP-bound traffic,[9] but points to a number of instances during the administrative proceedings in which it did. In testimony during the hearing before the DTE on October 9, 2005, Global NAPs' expert, Lee Selwyn, testified with respect to the VNXX issue as follows:

> Let me first preface my remarks on [the VNXX issue] by making the point that we are speaking here of traffic originating by Verizon customers, terminating to Global NAPs, that is not ISP-bound traffic. ISP-bound traffic is not subject to any treatment other than the reciprocal-compensation arrangement as set forth in the FCC's ISP Remand Order.

In its brief to the DTE after the hearing, Global NAPs reiterated this point:

> In the ISP Remand Order, the FCC determined that inter-carrier compensation for ISP-bound traffic is solely within the jurisdiction of the FCC and that on a going forward basis, state commissions have been preempted from addressing the issue. Thus the Department has no jurisdiction to impose access charges or other limitations on ISP in-bound traffic. . . . The Arbitration Order should be clear that the Interconnection Agreement is not intended to regulate inter-carrier compensation for ISP-bound traffic in any manner.

Global NAPs made the same argument in its reply brief to the DTE and in a February 27, 2003 letter to the DTE after the DTE issued its December 12, 2002 order. The DTE rejected these arguments,

---

[9] Global NAPs states that it did not do so because it was laboring under the impression that there was no real dispute on the issue.

requiring Global NAPs to pay access charges to Verizon for ISP-bound VNXX traffic under the intrastate tariffs.

Global NAPs also argues that it could not voluntarily consent to the jurisdiction of the DTE to determine access charges, because the TCA requires arbitration before the DTE under 47 U.S.C. § 252(b) when negotiation leaves open issues, and because "[t]he DTE may not enlarge its own subject matter jurisdiction beyond that granted to it by the Act and FCC rulings implementing the TCA. Neither may DTE jurisdiction be expanded by agreement of DTE litigants."

Global NAPs' use of the phraseology of jurisdiction may have led to some confusion. Questions about federal preemption of state law in this context may or may not be properly thought of as "jurisdictional" in nature. Cf. Wolf v. Reliance Standard Life Ins. Co., 71 F.3d 444, 446-49 (1st Cir. 1995) (holding that ERISA preemption is not jurisdictional but a waivable affirmative defense).

In the end, however the claim is characterized, Global NAPs properly presented an issue of federal preemption to the DTE, and the DTE rejected Global NAPs' argument. This does not mean it waived federal court review of the DTE's conclusion on that question. See Global NAPs I, 396 F.3d at 21-22 ("[T]he federal courts have subject matter jurisdiction to review state agency determinations under the TCA for compliance with federal law,

pursuant to 28 U.S.C. § 1331."); United States v. R.I. Insurers'
Insolvency Fund, 80 F.3d 616, 619 (1st Cir. 1996) ("[A] federal
preemption ruling presents a pure question of law subject to
plenary review.").

**IV**.

Preemptive Effect of the ISP Remand Order

We reach the merits of Global NAPs' claim, confining
ourselves to the record before the agency. This case presents a
pure issue of law and the parties have asked us to decide it.
Furthermore, we may affirm on any ground supported by the record.
See Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 13 (1st Cir. 2003).

Before reaching the merits of Global NAPs' claim,
however, we must deal with an issue raised by the DTE, but rejected
by Verizon, regarding the appropriate standard of review of state
commission conclusions of federal law made pursuant to an
arbitration under 47 U.S.C. § 252(b).

A.          Standard of Review of the DTE's Determination of
            Preemption Issue

The DTE argues that "judicial review of an interpretation
of the [TCA] by a state commission in an arbitration should be
limited to the question whether the state commission's
interpretation of the [TCA] is reasonable."[10]  The DTE draws an

_____

[10] To the extent the DTE is arguing for a broad, Chevron-like
deference to the state agency whenever it has made a determination
regarding the meaning of an FCC order, see Chevron U.S.A., Inc. v.
Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), that line of

-23-

analogy to the deferential standard of review given arbitral awards under the Federal Arbitration Act (FAA), as expressed in cases like JCI Communications, Inc. v. International Brotherhood of Electrical Workers, Local 103, 324 F.3d 42, 48 (1st Cir. 2003).

The DTE argues that because Congress used the term "arbitration" in § 252(b), we should treat state commission arbitral decisions with the same deference as arbitral decisions under the FAA, which predates the TCA. The DTE points out that Congress used terms other than "arbitration" to describe other types of actions taken by state commissions.

The DTE's position has no basis either in the TCA, its legislative history, or in case law. The DTE points to nothing more than the use of the term "arbitration" in the TCA. The DTE's argument, furthermore, is in flat conflict with our holding in Global NAPs I, where, in the context of review of a decision pursuant to an arbitration, we held that determinations of federal law by state agencies under the TCA were subject to de novo review. See 396 F.3d at 23. We noted in Global NAPs I that "[e]ach of the Circuits that has addressed the standard of review under the TCA has held that where the state agency determination rests

---

reasoning has already been foreclosed by this court in Global NAPs I: "Since the FCC, and not the individual state commissions, is the agency with the power granted by Congress to administer the TCA, through the formulation of policy, rulemaking, and regulation, we do not afford deference to the DTE's interpretation of the statute under [Chevron]." 396 F.3d at 23 n.7.

principally on an interpretation of the TCA, de novo review is applied." Id. at 23 n.8. A number of circuits have reached this conclusion in the context of federal court review of state commission arbitrations under the TCA. See, e.g., MCI Telecomms. Corp. v. Ohio Bell Tel. Co., 376 F.3d 539, 548 (6th Cir. 2004) (de novo review of questions of federal law after state commission arbitration); Ind. Bell Tel. Co. v. McCarty, 362 F.3d 378, 383 (7th Cir. 2004) (same); MCImetro Access Transmission Servs., Inc. v. BellSouth Telecomms., Inc., 352 F.3d 872, 876 (4th Cir. 2003) (same).

The DTE states that it "does not seek consideration of broader questions [than review of arbitration] regarding the proper standard of judicial review for other determinations by state commissions under the [TCA]." If we were to accept the DTE's position, it would create a strange result. The standard of review would vary not by the nature of the question presented (interpretations of the TCA) but by the nature of the proceeding in which the question is presented. Thus, under the DTE's view, a state commission's conclusions of federal law when it is acting as an arbitrator under § 252(b) would be subject to deferential review, but the very same conclusions about the TCA made pursuant to other state commission proceedings, such as the § 252(e) approval process, would be subject to de novo review. Congress

-25-

surely did not intend such an odd result merely by using the term "arbitration" in the TCA.

We review de novo the DTE's conclusion that the ISP Remand Order did not preempt its authority to regulate access charges for interexchange VNXX ISP-bound traffic. Cf. Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 22 (1st Cir. 2002) (holding that issues based on specified provisions of the TCA "present questions that a federal district court determines in the first instance without any deference to the [local zoning] board").

B.      Preemption

"The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law." La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368 (1986).  "Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation."[11]  Id. at 369; see also City of New York v. FCC, 486 U.S. 57, 64 (1988) ("[I]n proper circumstances the agency may determine that its authority is exclusive and pre-empts any state efforts to regulate in the forbidden area.").

---

[11] There is no claim that the TCA itself either expressly or impliedly preempts the state regulation in question here. See Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 15 (1st Cir. 2000) (describing branches of preemption doctrine).

In arguing for a broad reading of the ISP Remand Order, Global NAPs points to language in the order which suggests that all ISP-bound traffic is subject to the FCC's jurisdiction. See, e.g., ISP Remand Order ¶ 1, 16 F.C.C.R. at 9153 ("[W]e reaffirm our previous conclusion [in the Internet Traffic Order] that traffic delivered to an ISP is predominantly interstate access traffic subject to [the FCC's jurisdiction]."); id. ¶ 57, 16 F.C.C.R. at 9177-78 (finding that ISP-bound traffic is "properly characterized as interstate access" and thus is subject to FCC jurisdiction). Even assuming that this language could cover the non-local ISP-bound calls at issue here, it does not help answer the question before us. A matter may be subject to FCC jurisdiction, without the FCC having exercised that jurisdiction and preempted state regulation. The question before us is whether the FCC intended in the ISP Remand Order to exercise its jurisdiction over the precise issue here, to the exclusion of state regulation. See Qwest Corp. v. Scott, 380 F.3d 367, 372 (8th Cir. 2004) ("There is no dispute in this case that the FCC has the power to preempt states from establishing standards and requiring reports relating to special access services. The fighting issue is whether the FCC actually intended to do so . . . .").

In this context, the law requires a clear indication that an agency intends to preempt state regulation. Hillsborough County v. Automated Med. Labs. Inc., 471 U.S. 707, 718 (1985) ("[B]ecause

-27-

agencies normally address problems in a detailed manner and can speak through a variety of means, . . . we can expect that they will make their intentions clear if they intend for their regulations to be exclusive."); see also Qwest Corp., 380 F.3d at 374 (finding no preemption of state regulation where FCC regulations were "notably agnostic" on the question).[12]

The requirement of a clear indication of the agency's intent to preempt is especially important in the context of the TCA, which "divide[d] authority among the FCC and the state commissions in an unusual regime of 'cooperative federalism,' with the intended effect of leaving state commissions free, where warranted, to reflect the policy choices made by their states." Global NAPs II, 427 F.3d at 46 (quoting P.R. Tel. Co. v. Telecomms. Regulatory Bd., 189 F.3d 1, 8 (1st Cir. 1999)). As we noted in Global NAPs II, "[t]he goal of preserving a role for the state regulatory commissions is reflected in a number of provisions in the TCA." Id. at 46-47.

Also relevant is Congress's express pre-TCA instruction that "nothing in this chapter [including 47 U.S.C. §§ 251, 252] shall be construed to apply or to give the Commission jurisdiction

---

[12] This requirement of clarity applies to express preemption, see Hillsborough County, 471 U.S. at 713, and to certain types of implied preemption, see id. at 718 (describing requirements of "field" preemption); Geier v. Am. Honda Motor Co., 529 U.S. 861, 881, 885 (2000) (conflict preemption should not be found "too readily in the absence of clear evidence").

with respect to . . . charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier." 47 U.S.C. § 152(b); see also La. Pub. Serv. Comm'n, 476 U.S. at 370, 379 (relying on § 152(b) to find that the FCC could not preempt state law depreciation regulation).

        With these principles in mind, we turn to the facts of this case.  Global NAPs does not challenge the DTE's determination that whether a call is local or "interexchange" should be based on the geographic endpoints of the call, or the decision to impose access charges on non-ISP-bound VNXX calls.  Rather, the challenge is to the DTE's imposition of access charges on that subset of VNXX calls that are bound for an ISP.  Global NAPs argues that we should determine the scope of preemption by limiting our examination to the text of the ISP Remand Order.  Verizon and the DTE[13] ask us to also consider the context in which the order was passed and the regulatory objectives of the order; they argue that the FCC only intended to preempt state regulation of intercarrier compensation for local ISP-bound traffic and did not address the question before the DTE.

_____

    [13] The DTE has joined almost all of Verizon's arguments on the merits.  At oral argument, the DTE explained that it did not wish to join Verizon's arguments to the extent that they reached outside the scope of the arbitration between the parties.

-29-

Regardless of which approach is used, the ISP Remand Order does not clearly preempt state authority to impose access charges for interexchange VNXX ISP-bound traffic; it is, at best, ambiguous on the question, and ambiguity is not enough to preempt state regulation here.

Global NAPs cannot point to any language in the order that explicitly preempts state regulation of access charges for the non-local ISP-bound traffic at issue. Instead, Global NAPs' central argument is that, in preempting state regulation of intercarrier compensation for ISP-bound traffic in the ISP Remand Order, the FCC did not expressly limit itself to traffic originating and terminating within a local calling area. It suggests that the interim federal regime of intercarrier compensation established by the ISP Remand Order actually applies to all ISP-bound calls, so that the preemptive effect of the order should extend to the access charges at issue here. Global NAPs points in particular to paragraph 82 of the ISP Remand Order, in which the FCC stated:

> The interim compensation regime we establish here applies as carriers renegotiate expired or expiring interconnection agreements. . . . This Order does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime we adopt here. Because we now exercise our authority under section 201 to determine the appropriate intercarrier compensation for ISP-bound traffic, however, state commissions will no longer have authority to address this issue.

<u>ISP Remand Order</u> ¶ 82, 16 F.C.C.R. at 9189.  It argues that if the FCC intended only to preempt state regulation of reciprocal compensation for local ISP-bound traffic, it would have expressed its intent more clearly, by specifying "local ISP-bound traffic."[14]

Global NAPs' argument ignores an important distinction. The FCC has consistently maintained a distinction between local and "interexchange" calling and the intercarrier compensation regimes that apply to them, and reaffirmed that states have authority over intrastate access charge regimes.  Against the FCC's policy of recognizing such a distinction, a clearer showing is required that the FCC preempted state regulation of both access charges and reciprocal compensation for ISP-bound traffic.  <u>Cf.</u> <u>Shaw's Supermarkets, Inc.</u> v. <u>N.L.R.B.</u>, 884 F.2d 34, 36 (1st Cir. 1989) ("The law that governs an agency's significant departure from its own prior precedent is clear. The agency cannot do so without explicitly recognizing that it is doing so and explaining why.").

Indeed, in the <u>ISP Remand Order</u> itself, the FCC reaffirmed the distinction between reciprocal compensation and access charges.  It noted that Congress, in passing the TCA, did not intend to disrupt the pre-TCA access charge regime, under which

_____

[14] Global NAPs also argues that we "confirmed" the preemptive effect of the <u>ISP Remand Order</u> in <u>Global NAPs II</u>, in which we said that the "FCC . . . made clear that it had exclusive regulatory authority to address the issue, so that state commissions no longer have the power to do the same."  427 F.3d at 40.  This was not a holding of the case; rather, it appeared in the background section of the opinion and merely paraphrased ¶ 82 of the <u>ISP Remand Order</u>.

"LECs provided access services . . . in order to connect calls that travel to points -- both interstate and intrastate -- beyond the local exchange.  In turn, both the Commission and the states had in place access regimes applicable to this traffic, which they have continued to modify over time."  ISP Remand Order ¶ 37, 16 F.C.C.R. at 9168.

Furthermore, the context in which the ISP Remand Order was issued casts additional doubt on Global NAPs' contention.  The Supreme Court has held that in interpreting its own prior cases "[i]t is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used."  See Cent. Va. Cmty. Coll. v. Katz, 126 S.Ct. 990, 996 (2006) (internal quotation marks omitted) (quoting Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399-400 (1821)).  Such a rule also properly applies to interpretations of agency orders, especially where the order itself details the background against which it was passed.  See Qwest Corp., 380 F.3d at 373-74 ("The FCC's statement . . . is susceptible of a broader interpretation if plucked out of context, but we conclude that when the [FCC order] is read as a whole, the [FCC's] expressed intent to preempt state regulation does not extend to performance measurements and standards.").

The issue that necessitated FCC action in the Internet Traffic Order and the ISP Remand Order was "whether reciprocal

compensation obligations apply to the delivery of calls from one LEC's end-user customer to an ISP in the same local calling area that is served by a competing LEC." ISP Remand Order ¶ 13, 16 F.C.C.R. at 9159; see also WorldCom, Inc., 288 F.3d at 430 (stating that the question before the FCC involved "calls made to [ISPs] located within the caller's local calling area"). The order expressly holds at a number of points that ISP-bound traffic is not subject to reciprocal compensation under § 251(b)(5). See ISP Remand Order ¶ 23, 16 F.C.C.R. at 9163 ("In [the statutory analysis] section, we reexamine our findings in the [Internet Traffic Order] and conclude that ISP-bound traffic is not subject to the reciprocal compensation requirement in section 251(b) . . . ."); id. ¶ 44, 16 F.C.C.R. at 9172 ("ISP-bound traffic . . . is excepted from the scope of the 'telecommunications' subject to reciprocal compensation under section 251(b)(5)."). There is no express statement that ISP-bound traffic is not subject to access charges.

In issuing the ISP Remand Order and setting forth the interim federal intercarrier compensation regime, the FCC was focused on limiting the problem of regulatory arbitrage. Id. ¶ 77, 16 F.C.C.R. at 9187 (the interim compensation regime "serves to limit, if not end, the opportunity for regulatory arbitrage"). In discussing these regulatory arbitrage opportunities, the FCC mentions only the problems created by requiring reciprocal

-33-

compensation for ISP-bound traffic. Id ¶ 68, 16 F.C.C.R. at 9181-82 ("Carriers . . . have the incentive to seek out customers, including but not limited to ISPs, with high volumes of incoming traffic that will generate high reciprocal compensation payments.").[15]

This court invited the FCC to file a brief as amicus curiae on the question of the preemptive effect of the ISP Remand Order. The FCC's helpful brief, while not taking a position on the outcome of this appeal, nonetheless supports the conclusion that the order did not clearly preempt state regulation of intrastate access charges. The brief states that "[t]he ISP Remand Order does not provide a clear answer to [the] question" of whether the order "was intended to preempt states from establishing" a requirement of intercarrier compensation for interexchange VNXX ISP-bound calls. It notes that "[i]n some respects, the ISP Remand Order appears to address all calls placed to ISPs" but also that "the administrative history that led up to the ISP Remand Order indicates that in addressing compensation, the Commission was focused on calls between dial-up users and ISPs in a single local calling area."

---

[15] Indeed, Verizon suggests that interpreting the ISP Remand Order as preempting state access charge regulation as well as reciprocal compensation regulation would create new opportunities for regulatory arbitrage, by requiring Verizon to pay compensation on all calls to ISPs, including "toll-free calls to ISPs . . . for which [ILECs] had previously received compensation under established rules."

Thus it concludes that the ISP Remand Order "can be read to support the interpretation set forth by either party in this dispute."

The FCC further notes that "in establishing the new compensation scheme for ISP-bound calls, the Commission was considering only calls placed to ISPs located in the same local calling area as the caller." According to the FCC, "[t]he Commission itself has not addressed application of the ISP Remand Order to ISP-bound calls outside a local calling area" or "decided the implications of using VNXX numbers for intercarrier compensation more generally."

In response to the FCC's brief, Global NAPs makes an argument that the DTE's imposition of access charges on VNXX ISP-bound traffic "stands as an obstacle to the accomplishment and execution of the full objectives of Congress" because the charges "obstruct the FCC's declared policy of a uniform, rather than patchwork, approach to the entire field of intercarrier compensation" and "obstruct the FCC's effort to implement key policies served by the [TCA]: universal service and competition in the provision of such service." This particular argument, if raised at all during initial briefing or oral argument, was barely done so and may have been waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Nonetheless, we address the point.

The Supreme Court has stated that, in determining whether a federal agency regulation impliedly preempts state law because it

poses an obstacle to federal policy, "a court should not find pre-emption too readily in the absence of clear evidence of a conflict."  See Geier v. Am. Honda Motor Co., 529 U.S. 861, 881, 885 (2000) (finding, in that case, such clear evidence).  Global NAPs does not point us to any clear evidence, in the ISP Remand Order or elsewhere, that the DTE's imposition of access charges on interexchange VNXX ISP-bound calls will obstruct the implementation of federal objectives.

As to the FCC's purported policy of a uniform approach to the "entire field" of intercarrier compensation, the ISP Remand Order was focused on a particular issue of intercarrier compensation; the FCC deferred fuller consideration of a unified system of intercarrier compensation to a future rulemaking.  See ISP Remand Order ¶ 2, 16 F.C.C.R. at 9153 ("[I]n this Order we . . . take interim steps to limit the regulatory arbitrage opportunity presented by ISP-bound traffic while we consider the broader issues of intercarrier compensation in the [Intercarrier Compensation NPRM] proceeding.").  As to the second point about access charges serving as an obstacle to the goal of universal service and competition for that service, Global NAPs says that the access charges will "virtually eliminate competition in the non-broadband internet access market."  In the face of the FCC's long-standing recognition of state authority over intrastate access charges, and in the absence of clear evidence that the access

-36-

charges here would impede competition, this argument is insufficient to find implied preemption.[16]

We find that there is a lack of clarity about whether the ISP Remand Order preempts state regulation of the access charges at issue here.[17] Given the requirement of a clear indication that the FCC has preempted state law, the ISP Remand Order does not have the broad preemptive effect that Global NAPs seeks to assign to it.

**V.**

We affirm the entry of judgment for Verizon and the DTE. Costs of appeal are awarded to Verizon and the DTE. The case is remanded to the district court for any further proceedings.

---

[16] Global NAPs, in its reply to the FCC's amicus brief, also asks us to refer the question of the preemptive effect of the ISP Remand Order to the FCC under the doctrine of primary jurisdiction. This was an argument certainly not discussed in the initial briefing or at oral argument, and we deem it waived. Zannino, 895 F.2d at 17.

[17] Global NAPs relies on a decision by a Connecticut federal district court, S. New Eng. Tel. Co. v. MCI WorldCom Commc'ns, Inc. (SNET), 359 F. Supp. 2d 229 (D. Conn. 2005), which held that the ISP Remand Order was unambiguous in its preemption of state regulation of intercarrier compensation for all ISP-bound traffic. Id. at 232. We simply disagree with the SNET court's analysis.