**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 14-1499 & 14-1664
_____

AT&T CORP.;
TELEPORT COMMUNICATIONS OF AMERICA, LLC

v.

CORE COMMUNICATIONS, INC.; ROBERT F.
POWELSON, Chairman of the Pennsylvania Public Utility
Commission in his official capacity; JOHN F. COLEMAN,
JR., Vice Chairman of the Pennsylvania Public Utility
Commission in his official capacity; WAYNE E.
GARDNER; JAMES H. CAWLEY; PAMELA A. WITMER,
Commissioners of the Pennsylvania Public Utility
Commission in their official capacity

> Robert F. Powelson, John F. Coleman, Jr.,
> James H. Cawley, Wayne E. Gardner and
> Pamela A. Witmer,
>
> Appellants in No. 14-1499
>
> Core Communications, Inc.,
>
> Appellant in No. 14-1664

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. No. 2-12-cv-07157)
District Judge:  Honorable Mary A. McLaughlin

Argued on November 19, 2014

Before:  AMBRO, SCIRICA and ROTH, <u>Circuit Judges</u>

(Opinion filed November 25, 2015)

Shaun A. Sparks, Esquire                    **(Argued)**
Colin W. Scott, Esquire
Kathryn G. Sophy, Esquire
Pennsylvania Public Utility Commission
P.O. Box 3265
Harrisburg, PA 17105

>           Counsel for Appellants Robert F.
>           Powelson, John F. Coleman, Jr.,
>           James H. Cawley, Wayne E. Gardner
>           and Pamela A. Witmer,


Christopher F. Van de Verge, Esquire    **(Argued)**
Core Communications, Inc.
209 West Street, Suite 302
Annapolis, MD 21401

Mark D. Bradshaw, Esquire
Stevens & Lee
17 North Second Street
16th Floor
Harrisburg, PA 17101

Counsel for Appellant Core
Communications, Inc.


Christopher S. Comstock, Esquire          (Argued)
Theodore A. Livingston, Esquire
Mayer Brown
71 South Wacker Drive
Chicago, IL 60606

Counsel for Appellees

Scott H. Angstreich, Esquire
Kellogg Huber Hansen Todd Evans & Figel
1615 M Street, N.W.
Suite 400
Washington, DC 20036

Counsel for Amicus Curiae Verizon

——————

O P I N I O N

——————

**ROTH**, Circuit Judge:

The members of the Pennsylvania Public Utility Commission (PPUC) and Core Communications, Inc., appeal the District Court's ruling granting summary judgment in favor of AT&T Corp. Core billed AT&T for terminating phone calls from AT&T's customers to Core's Internet Service Provider (ISP) customers from 2004 to 2009. When AT&T refused to pay, Core filed a complaint with the PPUC, which ruled in Core's favor. AT&T then filed suit in federal court seeking an injunction on the ground that the PPUC lacked jurisdiction over ISP-bound traffic because such traffic is the exclusive province of the Federal Communications Commission. Because we find that the FCC's jurisdiction over local ISP-bound traffic is not exclusive and the PPUC orders did not conflict with federal law, we will vacate the judgment of the District Court and remand this case for entry of judgment in favor of Core and the members of the PPUC.

## I.

## A.

Congress passed the Telecommunications Act of 1996[1] (TCA) to "fundamentally restructure[] local telephone markets."[2] Before the TCA, local telephone service companies operated as government-regulated monopolies. "States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC)."[3] One of the TCA's principal aims "was to end local telephone monopolies and develop a national telecommunications policy that

---

[1] 47 U.S.C. § 151 *et seq.*
[2] *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999).
[3] *Id.*

4

strongly favored local telephone market competition."[4]  The TCA thus created two classes of LECs:  the new market entrants are considered "competitive" LECs (CLECs) and the former state-regulated monopolies are designated "incumbent" LECs (ILECs).[5]

Recognizing the considerable barriers to entry associated with building out a network, the TCA required ILECs to allow CLECs to connect to their preexisting networks.[6]  "Interconnection allows customers of one LEC to call the customers of another, with the calling party's LEC (the 'originating' carrier) transporting the call to the connection point, where the called party's LEC (the 'terminating' carrier) takes over and transports the call to its end point."[7]  Without mandatory interconnection, a CLEC's customers would not be able to connect with friends or family who are customers of other phone companies—whether ILEC or CLEC.

Interconnection, of course, costs money.  The TCA aimed to solve the problem of cost allocation by requiring reciprocal payment arrangements, best understood as an

---

[4] *Global NAPs, Inc. v. Verizon New England, Inc.* (*Global NAPs II*), 454 F.3d 91, 93 (2d Cir. 2006) (citations omitted).

[5] *See* 47 U.S.C. § 251.  The term "competitive local exchange carrier" does not appear in the statute, but is commonly used to describe the non-incumbent LECs.  *See, e.g.*, *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 498 (3d Cir. 2001).

[6] *See* 47 U.S.C. § 251(c)(2).

[7] *Global NAPs Cal., Inc. v. Pub. Utils. Comm'n of Cal.*, 624 F.3d 1225, 1228 (9th Cir. 2010).

"originator pays" rule. "In basic terms, when a customer of Carrier A places a local call to a customer of Carrier B, Carrier A must pay Carrier B for terminating the call, and vice versa."[8] "The logic behind this system was that, over time, the number of calls going each way would be essentially the same, and no LEC would pay more than its fair share of the costs associated with terminating other LECs' traffic."[9] Thus, all LECs have "[t]he duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."[10] But because the incumbents' established market power gave them a potentially overwhelming advantage in negotiations, ILECs have a duty

---

[8] Peter W. Huber, *et al.*, Federal Telecommunications Law § 5.11.2 (2d ed. 1999). The FCC clarified the compensation rules shortly after the TCA came into effect. It determined that reciprocal compensation rules "apply only to traffic that originates and terminates within a local area"—that is, local traffic. *See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Interconnection Between Local Exchange Carriers and Commercial Mobile Radio Service Providers*, 11 FCC Rcd. 15499, 16013 ¶ 1034 (1996) (*Local Competition Order*). Long distance calls, in contrast, are subject to "access charges," 47 C.F.R. § 69.2(a), which "long distance companies are required to pay local-exchange carriers for the use of local network facilities." *Global NAPs II*, 454 F.3d at 95.

[9] *AT&T Commc'ns of Cal. v. Pac-West Telecomm, Inc.*, 651 F.3d 980, 984 (9th Cir. 2011).

[10] 47 U.S.C § 251(b)(5).

to negotiate interconnection agreements in good faith (as does the requesting telecommunications carrier).[11]

Congress also provided an enforcement mechanism to ensure the formation of interconnection agreements. Under 47 U.S.C. § 252, either party to an interconnection agreement may request that the relevant state commission participate in contract negotiations and mediate any differences.[12] If that fails, either LEC may petition the same state commission to arbitrate unresolved issues.[13] But because § 252 proceedings govern only ILEC-CLEC disputes, it "leaves something of an enforcement gap: CLECs have statutory duties to interconnect with other LECs . . ., but there is no procedure specified for one CLEC to require another CLEC to enter into an interconnection agreement that would govern the terms of those duties."[14] Accordingly, CLECs sometimes transmit traffic to each other without interconnection agreements.

**B.**

The advent of dial-up Internet invalidated the assumptions behind reciprocal arrangements. Suddenly, many customers called ISPs with longer-duration calls that, unlike calls to friends and family, were never returned. The FCC soon realized that this situation "creat[ed] an opportunity for regulatory arbitrage."[15] "Because traffic to

---

[11] *Id.* § 251(c)(1).

[12] *Id.* § 252(a)(2).

[13] *Id.* § 252(b)(1).

[14] *Pac-West*, 651 F.3d at 983 n.3.

[15] *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 16 FCC Rcd. 9151, 9187 ¶ 21 (2001) (*ISP Remand Order*).

ISPs flows one way, so does money in a reciprocal compensation regime,"[16] and if a carrier could create a customer base entirely out of ISPs, it could be paid to terminate calls, without ever reciprocating. Indeed, "[b]efore long, reciprocal compensation on ISP-bound traffic was costing ILECs billions."[17]

The FCC sought to address the problem in its 1999 *Declaratory Ruling*.[18] Because the FCC generally has jurisdiction over interstate communications and not purely intrastate communications,[19] the FCC first considered its own jurisdiction using its traditional end-to-end jurisdictional analysis.[20] The FCC found that although calls to the ISP

---

[16] *Id.*

[17] Huber, *et al.*, Federal Telecommunications Law § 5.11.2 (emphasis omitted).

[18] *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Inter-Carrier Compensation for ISP-Bound Traffic*, 14 FCC Rcd. 3689 (1999) (*Declaratory Ruling*).

[19] *See* 47 U.S.C. § 152.

[20] *Declaratory Ruling*, 14 FCC Rcd. at 3690 ¶ 1. In a later order, the FCC provided a useful breakdown of its end-to-end jurisdictional approach:

> Using an end-to-end approach, when the end points of a carrier's service are within the boundaries of a single state the service is deemed a purely intrastate service, subject to state jurisdiction for determining appropriate regulations to govern such service. When a service's end points are in different states or

itself were local, "the ultimate destination" is an "Internet website that is often located in another state," so it asserted jurisdiction over ISP-bound traffic.[21] More specifically, the FCC found that local ISP-bound traffic was "jurisdictionally mixed" because it "appears to be largely interstate."[22]

Following the same reasoning, the FCC found that the reciprocal compensation scheme of § 251, which applies to local traffic,[23] does not apply to ISP-bound traffic.[24] The FCC noted that, until it adopted a rule creating a new compensation structure, parties could voluntarily, but were not required to, include ISP-bound traffic in their otherwise mandatory interconnection agreements under §§ 251 and 252.[25] Despite the non-local nature of the traffic, the FCC

---

> between a state and a point outside the United States, the service is deemed a purely interstate service subject to the Commission's exclusive jurisdiction. Services that are capable of communications both between intrastate end points and between interstate end points are deemed to be "mixed-use" or "jurisdictionally mixed" services.

*In re Vonage Holdings Corp.*, 19 FCC Rcd. 22404, 22413 ¶ 17 (2004) (footnotes omitted).

[21] *Declaratory Ruling*, 14 FCC Rcd. at 3697 ¶ 12.

[22] *Id.*

[23] *See Local Competition Order*, 11 FCC Rcd. at 16013 ¶ 1034.

[24] *See generally Declaratory Ruling*, 14 FCC Rcd. at 3703-06 ¶¶ 21-27.

[25] *Id.* at 3703 ¶ 22.

still saw a role for state commissions to decide, as part of the § 252 arbitrations, whether reciprocal compensation should be required in a specific case.[26]

After the FCC issued the *Declaratory Ruling*, ILECs petitioned for review in the Court of Appeals for the District of Columbia Circuit.[27] The court vacated the ruling reasoning that, because the FCC considered the traffic local for some purposes, the FCC had failed to justify why § 251 did not apply to the admittedly local traffic despite its "largely interstate" character.[28] Although the standard end-to-end jurisdictional analysis was valid on its own terms, the FCC had extended the reasoning to determine that the traffic was non-local for substantive rules. The court held that the FCC provided no rationale for that inferential leap.[29] Notably, the court did not question or alter the jurisdictional analysis; it merely noted that the FCC had not demonstrated that the analysis was appropriate for any *other* use.

In 2001, the FCC responded with the *ISP Remand Order*, reaching the same substantive conclusion—that local ISP-bound traffic is not subject to reciprocal compensation—but on different legal grounds. The FCC found that it had previously erred by trying to rigidly classify ISP-bound traffic as either local or long-distance for the purposes of

---

[26] *Id.* at 3704-05 ¶ 25.

[27] *Bell Atl. Tel. Companies v. FCC*, 206 F.3d 1 (D.C. Cir. 2000).

[28] *Id.* at 8 (noting a prior FCC litigation position "that a call to an information service provider is really like a call to a local business that then uses the telephone to order wares to meet the need").

[29] *Id.* at 5.

§ 251(b)(5), and the Commission should instead have recognized that such traffic is a hybrid.[30] Accordingly, the FCC ceased construing § 251(b)(5) using that dichotomy, instead reading § 251(g) to "limit[] the reach of the reciprocal compensation regime mandated in section 251(b)."[31] Thus, all local traffic would be governed by the reciprocal compensation scheme unless it fell into one of the three categories outlined in § 251(g): "exchange access, information access, and exchange services."[32] The FCC found that ISP-bound traffic is indeed "information access," and is therefore exempt from § 251(b)(5).

Having established a new rationale for exempting ISP-bound traffic from reciprocal compensation, the FCC invoked its general powers under § 201(b) "to address the market distortions under the current intercarrier compensation

---

[30] *ISP Remand Order*, 16 FCC Rcd. at 9164 ¶ 26-27 ("Upon further review, we find that the Commission erred in focusing on the nature of the service (i.e., local or long distance) and in stating that there were only two forms of telecommunications services – telephone exchange service and exchange access – for purposes of interpreting the relevant scope of section 251(b)(5) . . .. This balancing act reflected the historical view that there were only two kinds of intercarrier compensation: one for local telephone exchange service, and a second (access charges) for long distance services. Attempting to describe a hybrid service (the nature being an access service, but subject to a compensation mechanism historically limited to local service) was always a bit of mental gymnastics."); *id.* at 9172 ¶ 45.

[31] *Id.* at 9166-67 ¶ 34 (citing 47 U.S.C. § 251(g)).

[32] *Id.* at 9170 ¶ 42.

11

regimes for ISP-bound traffic."[33]  The Commission set forth a new "interim" compensation including four specific rules, the most important of which is the rate cap:  an upper bound to the prices LECs could charge for ISP-bound traffic.  This cap would, over time, move from $0.0015 per minute of use (MOU) to $0.0007/MOU, where it now continues to reside.[34] The FCC made clear that these caps are *caps*, not rates, and as such they "have no effect to the extent that states have ordered LECs to exchange ISP-bound traffic either at rates below the caps or on a bill and keep basis (or otherwise have not required payment of compensation for this traffic)."[35]

In addition, the interim compensation scheme created a growth cap, limiting the overall number of minutes a LEC could be compensated for ISP traffic;[36] the "new markets rule," under which LECs that were not already party to interconnection agreements would exchange ISP-bound

---

[33] *Id.*.at 9186 ¶ 77; *see also* 47 U.S.C. § 201(b) ("All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . ..  The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.").

[34] *Id.* at 9190-91 ¶ 85.

[35] *Id.* at 9188 ¶ 80.  In a "bill-and-keep" compensation regime, each carrier bills its own customers for "the cost of both originating traffic that it delivers to the other network and terminating traffic that it receives from the other network."  *Id.* at 9154 ¶ 2 n.6.

[36] *Id.* at 9187 ¶ 78, 9191 ¶ 86.

traffic on a bill-and-keep basis;[37] and the "mirroring rule," under which ILECs that seek to benefit from the rate caps must also terminate their own traffic at the same rate.[38] In 2004, the FCC granted a petition from Core requesting forbearance from enforcement of the new markets and growth cap rules, finding that they were no longer in the public interest.[39]

The *ISP Remand Order* was also challenged in the Court of Appeals for the D.C. Circuit.[40] The court again rejected the FCC's basis for exempting ISP-bound traffic from §251(b), but determined that there were probably "other legal bases for adopting the rules chosen by" the FCC.[41] The court remanded to the FCC for better reasoning, but left the rules in place.[42]

In 2008, after WorldCom successfully petitioned the Court of Appeals for the D.C. Circuit for a writ of mandamus, the FCC released the *ISP Mandamus Order*, in which the FCC concluded that ISP-bound traffic is subject to

---

[37] *Id.* at 9188-89 ¶ 81.

[38] *Id.* at 9193-94 ¶ 89.

[39] *Petition of Core Comm., Inc. for Forbearance under 47 U.S.C. § 160(C) from Application of the ISP Remand Order*, 19 FCC Rcd 20179, 20186 (2004) (*Core Forbearance Order*), *aff'd*, *In re Core Commc'ns, Inc.*, 255 F.3d 267 (D.C. Cir. 2006).

[40] *Worldcom v. FCC*, 288 F.3d 429, 430 (D.C. Cir. 2002).

[41] *Id.*

[42] *Id.*

§ 251(b)(5),[43] but reasoned that the traffic could be treated differently due to the FCC's broad § 201 authority to regulate and the savings clause in § 251(i).[44] The effect of the order was to "maintain the $.0007 cap and the mirroring rule pursuant to [the FCC's] section 201 authority," as a placeholder until the Commission develops a more comprehensive compensation regime.[45] Of the "interim" rules set out by the *ISP Remand Order*, the rate caps and mirroring rule are still in force today.

## C.

Core and AT&T are both CLECs operating in Pennsylvania. Between 2004 and 2009, AT&T provided local and long distance telephone service to its customers. Over the same time period, Core's only customers were ISPs that provided dial-up internet connections to at-home internet users. AT&T's customers placed calls to Core's customers in order to gain dial-up access to the internet. All of the calls at issue were local, originating and terminating in the same local

---

[43] *In re High-Cost Universal Serv. Support Fed.-State Joint Bd. on Universal Serv. Lifeline & Link Up Universal Serv. Contribution Methodology Numbering Res. Optimization Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 Developing A Unified Intercarrier Comp. Regime Intercarrier Comp. for ISP-Bound Traffic IP-Enabled Servs.*, 24 FCC Rcd. 6475, 6478 ¶ 6, 6480 ¶ 8 (2008) (*ISP Mandamus Order*).
[44] *Id.* at 6483 ¶ 18; *see also* 47 U.S.C. § 251(i) ("Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 of this title.").
[45] *ISP Mandamus Order*, 24 FCC Rcd. at 6489 ¶ 29.

exchange area. Each AT&T customer's call was delivered by AT&T to Verizon (the local ILEC), which then sent the call to Core, and Core terminated the call to the ISP.

Core did not bill AT&T for these calls immediately. During the time period at issue, Core had an "intrastate switched access tariff" on file with the PPUC that specified Core's rate for terminating long-distance calls but did not relate to local calls. In January 2008, Core billed AT&T for calls dating back to June 2004 at the long-distance rate specified in its state tariff, $0.014/MOU. AT&T refused to pay, claiming that it believed the traffic had been exchanged on a bill-and-keep basis.[46]

On May 19, 2009, Core filed a complaint with the PPUC against AT&T, seeking payment at its long-distance rate for terminating the calls. AT&T moved to dismiss the complaint on the ground that the PPUC lacked jurisdiction to hear the dispute because the calls were subject to the exclusive jurisdiction of the FCC. On December 5, 2012, the PPUC issued a final order holding that it had jurisdiction to hear the dispute, and that federal law, including the *ISP Remand Order*, applied. The PPUC found that its ability to set rates for ISP-bound traffic was preempted by the *ISP Remand Order*, and because the rate charged by Core was greater than the federal cap, the federal cap of $0.0007/MOU should be applied as the new rate. Accordingly, the PPUC ordered that AT&T pay Core for terminating calls at the lower rate. Additionally, pursuant to a four-year state statute

---

[46] AT&T similarly exchanges local traffic on a bill-and-keep basis with other CLECs in the area. For a definition of "bill-and-keep," see *supra* n. 35.

of limitations,[47] the PPUC limited Core's recovery to calls terminated on or after May 19, 2005. The PPUC ultimately ordered AT&T to pay a total of $254,029.89 to Core by September 18, 2013.

AT&T then filed suit in the U.S. District Court for the Eastern District of Pennsylvania, seeking to enjoin enforcement of the PPUC's order. Soon after, AT&T moved for a preliminary injunction. Because the suit involved only legal issues, the District Court converted AT&T's motion to a motion for summary judgment. In the District Court, as here, AT&T argued that the PPUC violated federal law because it 1) lacked jurisdiction; 2) awarded charges at a rate not contained in any federal tariff or contract, violating 47 U.S.C. §§ 201 and 203; 3) allowed Core to recover reciprocal compensation without a reciprocal compensation arrangement, violating 47 U.S.C. § 251(b)(5); 4) impermissibly engaged in retroactive ratemaking; and 5) applied the incorrect statute of limitations. The District Court agreed that the PPUC lacked jurisdiction, and accordingly, did not address the remaining four issues. Core and the members of the PPUC appealed.

After lodging the appeal, the PPUC filed a separate Petition for Declaratory Order with the FCC asking whether "state commissions have the authority to apply federal telecommunications law to adjudicate intercarrier compensation disputes" between two CLECs that indirectly exchanged ISP-bound calls without an interconnection agreement. The formal public comment cycle on the PPUC's petition closed July 30, 2014. Before oral argument on

---

[47] *See* 66 Pa. Cons. Stat. § 1312.

16

November 19, 2014, we asked the FCC to comment on this case. On November 4, 2014, the FCC sent a letter to the Court declining to do so, reasoning that it could not comment because there was an open FCC administrative proceeding presenting the same question between the same parties. Accordingly, after oral argument, we held the case *c.a.v.* until June 30, 2015, to give the FCC time to make a determination. As the FCC has yet to rule on the PPUC's petition, we now proceed without its input.

## II.[48]

The Communications Act of 1934 created the FCC and gave it the power to regulate interstate communications.[49] The Act originally designated all communications as either interstate or intrastate, giving the FCC jurisdiction over solely interstate communications and leaving the states with jurisdiction over intrastate communications.[50] In 1996, however, the TCA significantly altered the clean lines of jurisdiction established in the 1934 Act.[51] "[T]he [TCA]

---

[48] The district court had jurisdiction pursuant to 28 U.S.C. § 1331 to review a decision by a state public utility commission to ensure compliance with federal law. *See MCI*, 271 F.3d at 498. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. Because the only issues presented are issues of law and there are no facts in dispute, our review is *de novo*.

[49] *See* 47 U.S.C. § 151(a).

[50] *See id.* § 152.

[51] Huber, *et al.*, Federal Telecommunications Law § 3.3.4; *see also* Phillip J. Weiser, *Federal Common Law, Cooperative Federalism, and Enforcement of the Telecom Act*, 76 N.Y.U.

17

provides that various responsibilities are to be divided between the state and federal governments, making it an exercise in what has been termed cooperative federalism."[52] "That is, 'Congress enlisted the aid of state public utility commissions to ensure that local competition was implemented fairly and with due regard to the local conditions and the particular historical circumstances of local regulation under the prior regime.'"[53]

---

L. Rev. 1692, 1743 (2001) (noting that although several of the 1996 Act's "provisions clearly anticipated that state agencies would play an important role and exercise considerable discretion in its implementation," the Act nevertheless "failed to articulate a clear vision of federal-state relations").

[52] *Core Commc'ns, Inc. v. Verizon Pa., Inc.*, 493 F.3d 333, 335 (3d Cir. 2007) (quoting *P.R. Tel. Co. v. Telecomms. Regulatory Bd. of P.R.*, 189 F.3d 1, 8 (1st Cir. 1999)); *see also Mich. Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 351 (6th Cir. 2003) ("The Act has been called one of the most ambitious regulatory programs operating under 'cooperative federalism,' and creates a regulatory framework that gives authority to state and federal entities in fostering competition in local telephone markets."); *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Texas*, 208 F.3d 475, 480 (5th Cir. 2000) ("The Supreme Court has recognized that the Act cannot divide the world of domestic telephone service 'neatly into two hemispheres,' one consisting of interstate service, over which the FCC has plenary authority, and the other consisting of intrastate service, over which the states retain exclusive jurisdiction." (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986))).

[53] *Id.* (quoting *Global NAPs, Inc. v. Mass. Dep't of Telecomm. and Energy,* 427 F.3d 34, 46 (1st Cir. 2005)).

The parties ask us to determine whether ISP-bound traffic is interstate or "jurisdictionally mixed," with the supposed attendant implications that, in the former case, the FCC has exclusive jurisdiction, and, in the latter, state and federal jurisdiction exist concurrently. The picture, however, is more complicated.

## A.

Whether a particular type of communications is interstate or intrastate is a technical question. To determine the answer to that question, we look to the Telecommunications Act of 1996 and the FCC's regulations interpreting that statute. We "defer to an agency's interpretation of its regulations, even in a legal brief, unless the interpretation is plainly erroneous or inconsistent with the regulations or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question."[54] This deference applies whether or not the question at issue is jurisdictional.[55].

---

[54] *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2261 (2011) (internal formatting removed); *accord Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012).

[55] *See City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1871 (2013) ("[W]e have consistently held that *Chevron* applies to cases in which an agency adopts a construction of a jurisdictional provision of a statute it administers." (quotation marks omitted)).

19

As described above, the FCC employs end-to-end jurisdictional analysis to determine whether communications are intrastate or interstate.[56] While the parties in this case ask us to determine whether the traffic is interstate or jurisdictionally mixed, the FCC has not always been so precise, often using the terms interchangeably. Thus, while we read the FCC's rulings to mean that the traffic is interstate, the inquiry will not end there.

The FCC's first pass at the question came in the *Declaratory Ruling*, where the Commission found that local ISP-bound traffic was "jurisdictionally mixed" because it "appears to be largely interstate."[57] Three more times throughout the order, the FCC used the phrase "largely interstate" to describe the traffic.[58] After the D.C. Circuit vacated the *Declaratory Ruling*, the FCC revisited its original finding in the *ISP Remand Order*. There the FCC used the terms "jurisdictionally mixed" and "interstate" interchangeably to describe both the original ruling and the traffic itself.[59] In other places, the *ISP Remand Order*

---

[56] *Bell Atl.*, 206 F.3d at 3.

[57] 14 FCC Rcd. at 3690 ¶ 1.

[58] *See id.* at 3703-06 ¶¶ 23, 25, 27.

[59] *Compare ISP Remand Order*, 16 FCC Rcd at 9152 ¶ 1 ("We previously found in the *Declaratory Ruling* that such traffic is interstate traffic subject to the jurisdiction of the Commission under section 201 of the Act and is not, therefore, subject to the reciprocal compensation provisions of section 251(b)(5)." (footnotes omitted)), *and id* at 9162 ¶ 21 ("In the *Declaratory Ruling*, the Commission concluded that Internet-bound traffic was jurisdictionally interstate and, thus, not subject to section 251(b)(5)."), *with id.* at 9160 ¶ 14

referred to ISP-bound traffic as being "predominantly interstate"[60] or having an "interstate component."[61] In one of the same paragraphs in which the order refers to the traffic as "predominantly interstate," the FCC also noted that it has "long held" ISP-bound traffic "to be interstate."[62] Thus, the *ISP Remand Order* treats the traffic as interstate, but treats "jurisdictionally mixed" as a synonym.

The FCC has addressed this question elsewhere as well. In 2011, the Ninth Circuit decided *AT&T Communications of California v. Pac-West Telecommunications*.[63] That case was factually similar to the one at hand, stemming from an AT&T subsidiary's refusal to pay for traffic exchanged with a CLEC with which it did not have an interconnection agreement. Indeed, the California Public Utilities Commission (CPUC) ruled against AT&T, just as the PPUC did here, and AT&T subsequently sued the CPUC and Pac-West in federal court, challenging, among other things, CPUC's jurisdiction to hear the dispute. When the Ninth Circuit asked the FCC for its view, the Commission filed an amicus brief, stating that it "has consistently held that ISP-bound communications are jurisdictionally interstate"

---

("The Commission found, therefore, that ISP-bound traffic . . . is jurisdictionally mixed and largely interstate, and, for that reason, the Commission found that the reciprocal compensation obligations of section 251(b)(5) do not apply to this traffic.").

[60] *Id.* at 9152 ¶ 1, 9164 ¶ 28, 9165 ¶ 29, 9176 ¶ 54.

[61] *Id.* at 9175 ¶ 52.

[62] *Id.* at 9164 ¶ 28.

[63] 651 F.3d 980 (9th Cir. 2011).

based on its end-to-end jurisdictional analysis.[64] But the same brief also asked the court to refrain from deciding whether the CPUC had jurisdiction.[65] The CPUC had applied a state tariff that exceeded the federal rate cap, and the FCC argued—and the court agreed—that the court did not need to decide the jurisdictional question because the *ISP Remand Order* applied even between two CLECs and the CPUC's application of the higher rate was preempted by the federal rate caps.[66] Thus, while we are left to address the question of a *state* commission's jurisdiction for the first time, the FCC's amicus brief states its position on *its own* jurisdiction clearly, and it accords with the statements in the *ISP Remand Order*.

Deferring to the FCC's determination, we find that local ISP-bound traffic is interstate for jurisdictional purposes.[67] Nevertheless, as a factual matter, the mixed nature of the traffic is not irrelevant.

### B.

We draw two further lessons from the FCC's treatment of the jurisdictional question. First, the jurisdictional determination reflects only a finding about the Commission's power to regulate under Section 201, not a view that its

---

[64] Amicus Br. of FCC, *Pac-West*, 651 F.3d 980 (No. 08-17030), at 7-8, 29 (*Pac-West* Amicus Br.).

[65] *Id.* at 29.

[66] *Pac-West,* 651 F.3d at 994.

[67] *Accord Pac-West,* 651 F.3d at 990 ("[T]here is no question that, for jurisdictional purposes, ISP-bound traffic is interstate in nature. ISP-bound traffic is therefore subject to the FCC's congressionally-delegated jurisdiction." (citation omitted)).

jurisdiction is exclusive. "A matter may be *subject* to FCC jurisdiction, without the FCC having exercised that jurisdiction and preempted state regulation."[68] This makes sense here because the thrust of the *ISP Remand Order*'s analysis focused on how the FCC's broad § 201 authority allows it to create the interim rules under the savings clause in § 251(i). The analysis established the FCC's power, but did not restrict or even address competing power from the states.

Several points further support this conclusion. By using the terms "interstate" and "jurisdictionally mixed" interchangeably in the *ISP* Remand *Order*, the FCC demonstrated that it could not have been ruling about exclusive jurisdiction. Based on the traditional understanding of the terms, purely interstate traffic is exclusively committed to the FCC,[69] and jurisdictionally mixed traffic is subject to

---

[68] *Global NAPs, Inc. v. Verizon New England, Inc.*, 444 F.3d 59, 71 (1st Cir. 2006) (*Global NAPs I*); *see alsoPac-West*, 651 F.3d at 991 ("[I]t is also well settled that, with the *ISP Remand Order* and related pronouncements, the FCC has *not* exercised its jurisdiction over all manifestations of ISP-bound traffic.").

[69] *See, e.g.*, *In re Vonage*, 19 FCC Rcd. at 22413 ¶ 17 ("When a service's end points are in different states or between a state and a point outside the United States, the service is deemed a purely interstate service subject to the Commission's exclusive jurisdiction."); *In re Am. Tel. & Tel. Co. and the Assoc. Bell Sys. Cos.*, 56 FCC. 2d 14, 20 ¶ 21 (1975) ("[T]he States do not have jurisdiction over interstate communications."), *aff'd*, *California v. FCC*, 567 F.2d 84 (D.C. Cir. 1977) (per curiam).

"dual federal/state jurisdiction."[70]   If the FCC believed the TCA committed ISP-bound traffic to its exclusive jurisdiction, it would have distinguished between the two. Elsewhere in the text, "the Order also explicitly reserves state commission authority in certain relevant matters."[71]   Finally, in the *Pac-West* amicus brief, the FCC both called ISP-bound traffic interstate and declined to take a position on whether the jurisdiction is exclusive.[72]   This would make no sense if interstate traffic necessarily implies exclusive jurisdiction.

Second, according to the FCC, "'mixed-use' or 'jurisdictionally-mixed' services are generally subject to dual federal/state jurisdiction, except where it is impossible or impractical to separate the service's intrastate from interstate components and the state regulation of the intrastate component interferes with valid federal rules or policies."[73] That is to say, where—as here—the interstate and intrastate components are inseparable,[74] state jurisdiction over mixed use services such as ISP-bound local traffic is tied to conflict preemption.  This view recognizes the "realities of technology and economics that belie such a clean parceling of responsibility" between the state and federal governments.[75]

---

[70] *In re Vonage*, 19 FCC Rcd. at 22413 ¶ 17.

[71] *Global NAPs II*, 454 F.3d at 100 (citing *ISP Remand Order* at 9187 ¶ 79 (A carrier may rebut presumptions regarding the amount of traffic that is ISP-bound by providing evidence "to the appropriate state commission.")).

[72] *Pac-West* Amicus Br. at 8, 29.

[73] *Id.*

[74] *See Sw. Bell Tel. Co. v. FCC*, 153 F.3d 523, 543 (8th Cir. 1998).

[75] *La. Pub. Serv. Comm'n*, 476 U.S. at 360.

A state is therefore both preempted and lacking jurisdiction to regulate ISP-bound local traffic if and only if the state regulation conflicts with federal law. Thus, "the question before us is whether the FCC intended in the *ISP Remand Order* to exercise its jurisdiction over the precise issue here, to the exclusion of state regulation."[76]

Discussing its implementation of the new rate caps in the *ISP Remand Order*, the FCC was clear that state rates were preempted and state commissions no longer had authority to set rates higher than the cap.[77] Because the FCC "exercise[d] [its] authority under section 201 to determine the appropriate intercarrier compensation for ISP-bound traffic . . . state commissions [] no longer have authority to address this issue."[78] Read in isolation, AT&T's interpretation—that the FCC meant to effect field preemption—is plausible. But just two paragraphs prior, the FCC was equally explicit that the rate caps are indeed *caps* and do not apply to rates lower than those federally mandated.[79] If there remain state rates to which the rate caps do not apply, the FCC cannot have intended field preemption.[80] This reading is further confirmed by the *ISP Mandamus Order*, in which the FCC "conclude[d] that it is appropriate to retain [the rate cap and

---

[76] *Global NAPs I*, 444 F.3d at 71.

[77] *ISP Remand Order*, 16 FCC Rcd. at 9189 ¶ 82.

[78] *Id.*

[79] *See id.* at 9188 ¶ 80.

[80] *See Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015) (field preemption "foreclose[s] any state regulation in the *area*" while conflict preemption "exists where compliance with both state and federal law is impossible" (internal quotations omitted)).

mirroring rule], but only on a transitional basis until a state commission . . . has established reciprocal compensation rates that are at or below \$.0007 per minute-of-use."[81] The FCC clearly contemplated states' continued involvement in ratesetting, and therefore we must conclude that the FCC meant only to preempt rates that *conflict* with its own regulation; that is, rates that exceed the cap.[82]

---

[81] *ISP Mandamus Order*, 24 FCC Rcd. at 6584 ¶ 198.

[82] The *Pac-West* Amicus Brief argued that the FCC "meant to pre-empt state reciprocal compensation regulation of ISP-bound traffic," and in the alternative that states cannot set a "rate for ISP-bound traffic under state law that exceeded the prescribed federal rate." *Pac-West* Amicus Br. at 26-27. Unlike a determination of its jurisdiction, however, we do not defer to an agency's legal determination regarding preemption, instead accepting it as influential, "depending on its thoroughness, consistency, and persuasiveness." *Wyeth v. Levine*, 555 U.S. 555, 577 (2009); *see also Pac-West*, 651 F.3d at 998 ("Although we do not defer to 'an agency's *conclusion* that state law is preempted,' we do defer to the FCC's interpretation of the compensation regime it created, barring some 'reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'" (quoting *Wyeth*, 555 U.S. at 576 and *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 881 (2011))). As explained above, when read in full, the *ISP Remand Order* implies not field preemption but conflict preemption, and a mere litigation position that argues for the former first and the latter in the alternative (submitted in a separate case, no less) is neither thorough, consistent, nor persuasive enough to merit deference here.

When faced with the possibility of applying rates that exceed the federal cap, the PPUC recognized the primacy of federal law and reduced the applicable rates to match the federal limit. This is where this case diverges from the facts of *Pac-West*. By lowering the state rates it applied, the PPUC avoided a conflict with federal law. Because there was no conflict, the PPUC's actions were not preempted.

AT&T argues, however, and the District Court concluded, that state commissions may only act pursuant to their role in mediating and arbitrating interconnection agreements under § 252 of the TCA.[83] But the TCA itself invites state involvement in more than § 252.[84] AT&T's argument ignores both the FCC's statements regarding state commissions' involvement in ratesetting and the cooperative federalism principles inherent in the TCA by presuming that the statute stripped states of all authority to act unless

---

[83] Section 252 clearly does not apply here because there is no interconnection agreement and both parties are CLECs, meaning neither party has a duty to negotiate an agreement. *See* 47 U.S.C. § 251(c).

[84] *See* 47 U.S.C. § 251(d)(3) ("In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that-- (A) establishes access and interconnection obligations of local exchange carriers; (B) is consistent with the requirements of this section; and (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.").

delegated back to them.[85]  The picture is simply not that clear-cut.[86]

AT&T's reliance on *MCI Telecommunications Corp. v. Bell Atlantic Pennsylvania*[87] is similarly misplaced.  *MCI* concerned sovereign immunity for states arbitrating interconnection agreements under § 252.  Under the Eleventh Amendment, we held that the states were granted a "gratuity" and were "voluntarily regulating on behalf of Congress" because Congress could have withdrawn all power from states, but instead allowed the states to keep some.[88] Accordingly, such states waived sovereign immunity and could be sued.[89]  But we also reasoned that although "Congress could have made that preemption complete," it did not.[90]  Rather, we stated that Congress "federalized the regulation *of competition for local telecommunications service*."[91] Based on the integrated system of cooperative

---

[85] *See* AT&T Br. at 27 ("Neither the Communications Act, the 1996 Act, nor the FCC have delegated jurisdiction to the PUC to set rates or otherwise regulate interstate traffic outside of a Section 252 proceeding.").

[86] *Accord Iowa Utils. Bd.*, 525 U.S. at 397 ("It would be gross understatement to say that the 1996 Act is not a model of clarity.").

[87] 271 F.3d 491

[88] *Id.* at 510 (quotation omitted).

[89] *Id.* at 498 (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999)).

[90] *Id.* at 510.

[91] *Id.* at 509 (emphasis added); *see also id.* at 510 (noting that "[t]he Act . . . validly preempted state regulation *over competition to provide local telecommunications service*" and that "*[r]egulating local telecommunications competition*

federalism that we have previously endorsed,[92] and which we reiterate today, we hold that although ISP-bound traffic is interstate, states retain jurisdiction to regulate ISP-bound traffic where the state regulations do not conflict with federal law.

## III.

Having established that the PPUC had jurisdiction to hear the dispute, we turn to AT&T's additional arguments that the PPUC's Orders violate federal law in four other ways.

## A.

AT&T contends that the PPUC Orders violate 47 U.S.C. §§ 201 and 203 because Core neither filed a federal tariff that would apply to billing for interstate services nor negotiated a contract with AT&T; thus, in light of that fact billing at any rate is "unreasonable."[93] For support, AT&T looks to a number of FCC adjudications where the "FCC rejected the idea that a CLEC could bill for interstate services

---

under the 1996 Act no longer is . . . an 'otherwise lawful' or 'otherwise permissible' activity for a state . . . [but] is an activity in which states and state commissions are not entitled to engage except by the express leave of Congress" (emphases added)).

[92] *Verizon Pa.*, 493 F.3d at 335.

[93] Considering that AT&T observes multiple times in its brief that it, as a CLEC, has no duty to negotiate in good faith, AT&T Br. at 11, 13, 35, and the PPUC observed in its initial decision that AT&T refused to negotiate in fact, *PPUC Initial Decision*, ¶¶ 42-44, J.A. 196-97, the latter accusation here that Core "failed to negotiate" a contract rings hollow.

without a federal tariff or contract covering the services."[94] But the cases AT&T cites all involve interstate switched-access services—that is, intercarrier compensation for long-distance calls between states.[95]  As we point out above, although ISP-bound local traffic is *jurisdictionally* interstate, it is still subject to state control unless otherwise preempted by the FCC.  Nothing in the *ISP Remand Order* requires federal tariffing; had the FCC intended that ISP-bound traffic rates be governed by federal tariffs, it would have set rates to be tariffed, not *rate caps* that set upper limits to state tariffs. ISP-bound traffic is therefore fundamentally different from interstate switched-access services, and there is no federal tariffing requirement.

## B.

AT&T next contends that the PPUC Orders violate 47 U.S.C. § 251(b)(5), which requires all LECs to "establish reciprocal compensation arrangements for the transport and termination of telecommunications."  According to AT&T, the statutory language explicitly requires an "arrangement," *i.e.*, a contract, before a LEC can recover § 251(b)(5) charges. This argument is unpersuasive for several reasons.  First, while § 251(b)(5) applies to ISP-bound traffic, the reciprocal arrangements for that traffic are governed by the *ISP Remand Order*.  This is the holding of the *ISP Mandamus Order*,[96] and

---

[94] AT&T Br. 49.

[95] *See, e.g.*, *AT&T Corp. v. All Am. Tel. Co.*, 28 FCC Rcd. 3477, 3494 ¶ 37 (2013) (confirming that LECs must file "file and maintain tariffs with the Commission for interstate switched access services").

[96] *ISP Mandamus Order*, 24 FCC Rcd. 6478 ¶ 6 ("[A]lthough ISP-bound traffic falls within the scope of section 251(b)(5),

as the Ninth Circuit held in *Pac-West*, the *ISP Remand Order* applies as much between two CLECs as between and an ILEC and a CLEC.[97] Thus, because the PPUC complied with the *ISP Remand Order*, it also complied with § 251(b)(5).

AT&T's argument also invites an odd result. Core is required by statute to terminate AT&T's traffic irrespective of a billing arrangement being put in place. Thus, if AT&T refuses to pay, Core is left no recourse because it followed the law and terminated all the calls it received even though it did not first arrange for payment. This view amounts to a default bill-and-keep arrangement, whereby neither side must pay unless each side comes to a voluntary agreement. But that was precisely the "new markets rule" that the FCC deemed no longer in the public interest in the *Core Forbearance Order*.[98] If that were the meaning of the *ISP Remand Order* and § 251(b)(5), the new markets rule never would have been necessary. And if we were to interpret § 251(b)(5) this way, we would render null the FCC's finding that such a rule is no longer in the public interest.

## C.

AT&T next argues that because no tariff was established, any rate above $0/MOU is impermissible retroactive ratemaking. Because these calls were local calls, the intrastate long distance tariff Core had filed with the

---

this interstate, interexchange traffic is to be afforded different treatment from other section 251(b)(5) traffic pursuant to our authority under section 201 and 251(i) of the Act.").

[97] *Pac-West,* 651 F.3d at 994.

[98] 19 FCC Rcd. at 20186 ¶ 21.

PPUC filed did not directly apply; it applied only between two *different* local exchange areas within the state. To accept AT&T's position, we would again be required to find that the default rate is $0/MOU, which is once again the new markets rule. But that is not the primary reason this argument fails.

"The purpose of the rule against retroactivity, and the closely related filed rate doctrine, is to ensure predictability."[99] The question is therefore whether, absent an agreement, it was predictable that the state commission would apply a rate equal to the federal rate cap. AT&T was on notice since 2001 that it could be subject to payment for the exchange of ISP-bound traffic and on notice since 2004 that a $0/MOU rate would not be the general default. While AT&T assumed this traffic was being transmitted on a bill-and-keep basis and it had bill-and-keep arrangements with other CLECs, Core charges other CLECs it interconnects with,[100] so there is no reason to think AT&T's assumption is the industry norm.

Though it may have been unclear precisely which rate the PPUC would apply, the federal cap was not only foreseeable, but the most likely rate. Four logical possibilities existed: Core's intrastate switched access tariff of $0.014/MOU, the TELRIC rate—a state commission rate calculated to defray costs[101]—of $0.002439/MOU, the federal

[99] *Qwest Corp. v. Koppendrayer*, 436 F.3d 859, 864 (8th Cir. 2006).

[100] *PPUC Initial Decision* ¶ 73, J.A. 200.

[101] "Total Element Long-Run Incremental Cost ('TELRIC') is used to figure the cost of phone service based on incremental cost of new equipment and new labor, or costs that would

cap of $0.0007/MOU, or $0/MOU. The first two were clearly not permissible not only because they conflict with the *ISP Remand Order*, but also because the rates are so much higher than the federal cap that AT&T should have known that whatever eventual rate the PPUC thought was fair would be capped by federal law. Of the two remaining choices, applying the cap as a rate was much more likely than allowing no compensation at all. Therefore, the PPUC Orders did not violate the rule against retroactive ratemaking.

## D.

Finally, AT&T argues that the PPUC Orders violate federal law by applying a four-year state statute of limitations to Core's claims instead of 47 U.S.C. § 415, which applies to "[a]ll actions at law by carriers for recovery of their lawful charges." But AT&T concedes that § 415(a) applies only to charges that are subject to federal tariffing requirements.[102] We also need not address whether the federal or state statute of limitations applies because, as the PPUC noted in its order, the proper federal statute of limitations is the four-year catch-all found at 28 U.S.C. § 1658. The catch-all applies to any federal civil action enacted after 1990 without a specific associated cause of action.[103] This includes § 251(b)(5), which became law in 1996, and under which this case

---

apply in a fully competitive environment." *PPUC Initial Decision* at 21 n.12, J.A. 200.
[102] *See Castro v. Collecto, Inc*., 634 F.3d 779, 786 (5th Cir. 2011).
[103] 28 U.S.C. § 1658.

arose.[104]  Thus, the PPUC's application of a four-year statute of limitations is proper.

**IV.**

AT&T had every reason to believe it could be charged for its customers' ISP-bound traffic that Core terminated. Rather than voluntarily negotiating an interconnection agreement with Core, AT&T waited, putting the onus on Core to come forward and negotiate.  In reality, the PPUC found that Core was entitled to compensation for the traffic, and if AT&T wanted to negotiate a bill-and-keep arrangement, it should have done so.

Federal law does not require that Core be compensated for the traffic.  The TCA's system of cooperative federalism exists specifically so that state public utility commissions can determine these kinds of questions for themselves, "with due regard to the local conditions and the particular historical circumstances of local regulation."[105]  The FCC established the boundary of the PPUC's jurisdiction by implementing rate caps.  When the PPUC chose to apply a rate equal to the federal rate cap, it respected that boundary, and furthered the very purpose of the TCA's scheme.

---

[104] *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 381 (2004) (maintaining that § 1658 applies not only "to entirely new sections of the United States Code[,]" but also to "amendment[s] to an existing statute").

[105] Huber, et al., Federal Telecommunications Law § 3.3.4, *quoted in Core Commc'ns, Inc.*, 493 F.3d at 335.

We will therefore vacate the judgment of the District Court and remand this case with instructions to grant summary judgment in favor of Core and the members of the PPUC.